IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

WALLACE B. RODERICK REVOCABLE LIVING
TRUST, TRUSTEE WALLACE B. RODERICK,
ON BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED,

    Plaintiff(s),

  vs.           Case No. 08-1330-JTM

XTO ENERGY, INC.,

    Defendant.

MEMORANDUM AND ORDER

  Several motions are before the court in this prospective class action by the plaintiff Wallace

B. Roderick Revocable Living Trust alleging that the class – composed of royalty owners of natural

gas wells in Colorado, Kansas, and Oklahoma – received inadequate royalties for natural gas

produced by defendant lessee XTO Energy, Inc. The defendant XTO has filed two motions to

dismiss. The first alleges that the implied covenant to market underlying plaintiff's claims is

recognized only in Colorado law, not in Kansas or Oklahoma. The second alleges that certain

portions of the present case should be dismissed in light of a similar class action under way in

Oklahoma. XTO has also filed a summary judgment motion, seeking dismissal of certain claims in

light of prior, settled class actions in Oklahoma and Colorado on the grounds of release and *res

judicata*. The plaintiff Roderick Trust has moved for additional time to respond to the motion for

summary judgment, in order to conduct discovery on certain issues. These motions are granted or denied as provided herein.

**Implied Covenant to Market**

XTO seeks dismissal of that portion of the Amended Complaint advancing claims for violation of the "Marketable Condition Rule." (Dkt. 37, at ¶ 57). It notes that the Amended Complaint states that the leases included implied covenants requiring XTO to "bear all costs of placing the gas (and constituent parts) in 'Marketable Condition,'" (*Id*. at ¶ 18), and that XTO "alone bears the expense of making all products marketable. Gas and its constituent parts are marketable only when in the physical condition and location to be bought and sold in a commercial marketplace." (*Id*. at ¶ 19). XTO seeks dismissal of all of the claims alleging breach of the Market Condition Rule outside of Colorado, arguing that the Rule is a unique feature of Colorado law, and that the cause of action is not recognized in Kansas or Oklahoma. XTO notes that in *Rogers v. Westerman Farm Co.*, 29 P.3d 887 (Colo. 2001), the Colorado Supreme Court has observed:

> Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace.

*Id*. at 906. It contends that the Kansas and Oklahoma have adopted versions of the rule which are more restrictive, that the law in those states recognizes that the "at the well" language in lease agreements authorizes the lessee to make reasonable charges for gathering and processing the gas. *See Smith v. Amoco Production Co.*, 31 P.3d 255 (Kan. 2001); *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (Kan. 1995); *Matzen v. Hugoton Production Co.*, 182 Kan. 456, 321 P. 2d 576 (Kan. 1958); *Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004); *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, 954 P.2d 1203 (Okla. 1998); *Johnson v. Jernigan*, 475 P.2d 396 (Okla. 1970).

The plaintiff responds with two arguments. First, it contends that the Amended Complaint does not advance some Colorado-specific version of the Marketable Condition Rule. It stresses the

"location" language cited from paragraph 19 of the Amended Complaint is the only time this term is used in the lengthy, 24-page complaint, and that the complaint provides no specific definition of the Marketable Condition Rule. The plaintiff contends that the Amended Complaint's language makes clear that it seeks recovery for breach of an implied covenant of marketability generally. Second, it argues that in any event the law of the three states is not dissimilar. According to the plaintiff, all three states recognize the existence of an implied condition of marketability, the only distinction being that Colorado holds that the determination of marketability, and hence the proper allocation of costs, is a question of fact, while Kansas and Oklahoma treat the issue as one of law.

A careful review of decisions from the three states establishes that, for gas leases which require that royalty interests are determined by the marketability of the gas "at the well," all three states impose a general obligation on the part of the lessee to render the gas marketable, and hold that such expenses may not be charged to lessors. However, the states disagree on whether the lessors may be charged for transportation expenses, and whether the issue is a question of law or fact.

The issue arises because natural gas is almost never produced in a marketable condition straight from the well.

> It is common knowledge that raw or unprocessed gas usually undergoes certain field processes necessary to create a marketable product. These field activities may include, but are not limited to, separation, dehydration, compression, and treatment to remove impurities.

*Mittelstaedt*, 954 P.2d at 1208. Of the most recent decisions from the three relevant states as to how to allocate these expenses between lessor and lessee, the decision by the Kansas Supreme Court in *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (1995) is the earliest.

In *Sternberger*, the court addressed the propriety of the lessee's charges for amortized transportation costs. Reviewing its earlier decisions in *Scott v. Steinberger*, 113 Kan. 67, 213 P. 646 (1923), *Voshell v. Indian Territory Illuminating Oil Co.*, 137 Kan. 160, 19 P.2d 456 (1933), and *Molter v. Lewis*, 156 Kan. 544, 134 P.2d 404 (1943), the court concluded that those cases

> are dispositive of the issue in this case [and] clearly show that where royalties are based on market price "at the well," or where the lessor receives his or her share of the oil or gas "at the well," the lessor must bear a proportionate share of the expenses in transporting the gas or oil to a distant market.

894 P.2d at 796. The court distinguished such reasonable transportation costs, which might be allocated to lessors, from "'gathering' or other production costs," which would not be. Id. at 800. The court explicitly agreed with the Colorado Supreme Court's conclusion in *Garman v. Conoco, Inc.*, 889 P.2d 652 (Colo. 1994) which "held as we believe the law in Kansas to be." *Id.* The court then summarized that holding:

> Once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners. The lessee has the burden of proving the reasonableness of the costs. Absent a contract providing to the contrary, a nonworking interest owner is not obligated to bear any share of production expense, such as compressing, transporting, and processing, undertaken to transform gas into a marketable product. In the case before us, the gas is marketable at the well. The problem is there is no market at the well, and in that instance we hold the lessor must bear a proportionate share of the reasonable cost of transporting the marketable gas to its point of sale.

*Id.*

In 1998, the Oklahoma Supreme Court in *Mittelstaedt* addressed a certified question from the Tenth Circuit as to the validity of fees imposed by lessees for transportation, blending, compression, and dehydration. 954 P.2d at 1204. Applying its prior decisions in *Johnson v. Jernigan* and *Wood v. TXO Production Corp.*, 1992 OK 100, 854 P.2d 880 (1992), the court held:

> Generally, costs have been construed as either production costs which are never allocated, or post-production costs, which may or may not be allocated, based upon the nature of the cost as it relates to the duties of the lessee created by the express language of the lease, the implied covenants, and custom and usage in the industry. We conclude that dehydration costs necessary to make a product marketable, or dehydration within the custom and usage of the lessee's duty to create a marketable product, without provision for cost to lessors in the lease, are expenses not paid from the royalty interest. However, *excess* dehydration to an already marketable product is to be allocated proportionately to the royalty interest when such costs are reasonable, and when actual royalty revenues are increased in proportion to the costs assessed against the royalty interest. It is the lessee's burden to show that the excess dehydration costs charged against the royalty interest occurred to a marketable product, i.e., that the cost is a post-production cost. It is also the burden of the lessee to show both the reasonableness of the costs and that the royalty revenues increased in proportion with the costs assessed against the royalty interest.

954 P.2d at 1209 (emphasis in original).

The court declined to hold that compression or blending costs to an already marketable product could not be proportionally charged against the lessors' interests:

> The certified question asks us to determine whether blending costs are a post-production expense. The exact nature of the "blending'" is not identified. The analysis for blending costs is the same as for dehydration costs. Blending costs necessary to make a marketable product are not costs allocated to the royalty interest. Blending costs to an already marketable product are to be allocated proportionately to the royalty interest when such costs are reasonable, and when actual royalty revenues increase in proportion to the costs assessed against the royalty interest. The lessee has the burden of showing the reasonableness of the cost, the proportional increase in revenues to the royalty interest, and that the cost was incurred to alter a marketable product. The lessee must show that the cost was a postproduction cost.
> ....
> Clearly, compression on the leased premises to push marketable gas into the purchaser's pipeline is a cost not allocated to the royalty interest. We decline to turn compression costs into costs paid by the royalty interest merely by moving the location of the compression off the lease. However, we recognize that when marketable gas is transported off the lease to a point where its constituents are changed, additional compression may then become necessary to push the changed product into a purchaser's pipeline. We conclude that offlease compression costs may be allocated to the royalty interests if such costs are reasonable, when actual royalty revenues increase in proportion to the costs assessed against the nonworking interest, and when the compression is associated with enhancing an already marketable product off the lease. The lessee bears the burden of showing the reasonableness of the cost and the increase in royalty revenues resulting from the compression costs.
> In sum, a royalty interest may bear post-production costs of transporting, blending, compression, and dehydration, when the costs are reasonable, when actual royalty revenues increase in proportion to the costs assessed against the royalty interest, when the costs are associated with transforming an already marketable product into an enhanced product, and when the lessee meets its burden of showing these facts.

*Id.* at 1209-10 (citation omitted).

The Colorado Supreme Court expressed its most recent view of the issue in *Rogers v. Westerman Farm Co.*, 29 P.3d 857 (Colo. 2001), where the court addressed the validity of charging lessors the expenses of gathering, compressing, and dehydrating natural gas prior to its entry in an interstate pipeline. The court in *Rogers* agreed that under its earlier decision in *Garman* "the duty to market is a covenant contained in every oil and gas lease," and lessees "alone must bear any expenses incurred in order for the gas to reach that marketable condition." *Id.* at 902, 903. However, the *Rogers* court stressed that "[n]owhere in *Garman* did we actually define marketable condition."

5

Id. at 903. The court specifically disagreed with the Kansas Supreme Court's interpretation in *Sternberger* that the "at the well" lease language provided a sufficient basis for concluding as a matter of law that transportation costs could be charged to the lessor's interests. 29 P.3d at 899. The court held that the proper allocation of expenses could not be determined by an interpretation of the "at the well" language in the leases, but by the implied covenant of marketability.[1]

The court then concluded that "marketability" is a function of both physical processing of the gas, and of the delivery of the gas to a place for sale.

> In defining whether gas is marketable, there are two factors to consider, condition and location. First, we must look to whether the gas is in a marketable condition, that is, in the physical condition where it is acceptable to be bought and sold in a commercial marketplace. Second, we must look to location, that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil and gas marketplace.

*Id*. at 905 (footnote omitted). Marketability exists when the gas "is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace." *Id*. at 906.

Further, the decision of whether gas is in a marketable condition "is a question of fact, to be resolved by a fact finder." *Id. See also* 29 P.3d at 905 n. 21 (citing with approval *Mittelstaedt* 954 P.2d at 1213 (Opala, J., dissenting) (arguing that Oklahoma law erred in holding that "certain costs [are] necessary to produce a marketable product" as a matter of law)).

---

[1]The *Rogers* court explicitly distinguished decisions such as *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225, 231, 240 (5th Cir.1984) (interpreting Mississippi law) and *Martin v. Glass*, 571 F.Supp. 1406, 1411 (N.D.Tex.1983) applying a severance based rule under which all post-production costs were deductible once the mineral is removed from the ground:

> We disagree, however, with these jurisdictions because they fail to recognize that the implied covenant to market controls the lessee's duty to make the gas marketable. Instead, these jurisdictions have adopted the rule that the lessee's duty has ended once gas is severed from the wellhead, and thus, any costs incurred subsequent to that physical removal are to be shared by the parties.

29 P.3d at 887l

The court will deny the motion to dismiss. XTO argues in its Reply that the plaintiff is wrongly attempting to "homogenize" the laws of the three states, and that a marketability claim under Colorado law has two separate prongs relating to physical condition and location. (Reply at 3-4.) It further stresses that the *Sternberger* decision was tied to a construction of the lease's "at the well language" rather than an implied covenant (*id*. at 6-8, 10-11). But while there are indeed non-trivial differences in the law of the three states,[2] this does not establish that it is entitled to dismissal of the implied covenant of marketability claims for Oklahoma and Kansas.

First, the Amended Complaint nowhere sets forth any argument that invokes *only* the Colorado version of the implied covenant of marketability, with its exclusion of transportation costs from allocation. Rather, the Amended Complaint alleges a violation of a general duty to market, and there are substantial grounds for concluding that both states protect such an interest.

While the *Rogers* court in Oklahoma suggested that its decision was based on an implied covenant to market as distinct from attempts to interpret the leases' "at the well" language, it is apparent that Kansas and Oklahoma both view their law as also imposing an implied covenant to market. Both Kansas and Oklahoma explicitly agree with *Garman*, the Colorado case recognizing an implied covenant of marketability. *See Sternberger*, 257 Kan. 315, 895 P.2d at 800 (*Garman* "held as we believe the law in Kansas to be"); *Mittelstaedt*, 954 P.2d at 1208 ("we agree with both *Sternberger* and *Garman*"). Further, in both jurisdictions the respective courts have implicitly recognized the existence of such claims. *See also Smith v. Amoco Production Co.*, 272 Kan. 58, 84-85, 31 P.3d 255, 273 (noting that "[w]hether Amoco has performed its duty under the implied covenant to market here is a question of fact," citing *Adolph v. Stearns*, 235 Kan. at 626, 684 P.2d 372); *XAE Corp. v. SMR Prop. Mgt.*, 968 P.2d 1201, 1203 (noting that it had "decided the royalty owner cases based on the implied covenant of marketability under the oil and gas lease").

---

[2]As noted earlier, Kansas has explicitly held that transportation costs are allocable to lessors, *Sternberger*, 894 P.2d at 800; Oklahoma holds that they may be allocable, if they are incurred after the product has already been rendered otherwise marketable. *Mittlestaedt*, 954 P.2d at 1210.

That Oklahoma and Kansas hold that under proper circumstances transportation costs may be allocated to lessors is not fatal to the plaintiff's claims. In its Response, the plaintiff explicitly disclaims any "claim that XTO is making transportation deductions" in Oklahoma or Kansas. (Resp. at 29). Read in the light most favorable to plaintiff, the Amended Complaint asserts claims that XTO charged for improper, non-transportation expenses in violation of its legal duty in each respective state, and the relief sought is not justified.

**Beer v. XTO**

Defendant XTO seeks dismissal of the claims here which would also fall within those claims advanced in a certified class action currently before the United States District Court for the Western District of Oklahoma, *Beer, et al., v. XTO Energy Inc*., Case No. CIV-07-798-L. XTO argues that, under the first-to-file rule, the court should enter an order dismissing the claims of those plaintiffs within the proposed class who also fall within the plaintiff class in *Beer.*

The *Beer* case involves claims by owners of gas wells in Kansas and Oklahoma alleging the improper subsidiary-based pricing by XTO. All of the wells involved in Beer are processed through XTO's Tyrone Plant in Timberland, Oklahoma.

The Amended Complaint here defines the proposed class as

All royalty owners of XTO Energy, Inc. (and its predecessors and successors) from wells located in Kansas, Colorado or Oklahoma that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1999 to the present.

Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); and (2) Defendant, its affiliates, predecessors, and employees, officers and directors.

(Dkt. 37, ¶ 10.) The Amended Complaint alleges defendant breached an implied covenant to place the gas in marketable condition at the exclusive cost of XTO, and to properly account and pay royalties, and that XTO breached this obligation by under payments. (*Id*. at ¶ 60). It alleges that XTO retained monies owing to the class unjustly, and that it should account for "such monies and

a disgorgement of such moneys, including recovery for monies wrongfully retained" with interest. (*Id*. at ¶ 64, 66).

> In *Beer*, the court certified as a class
>
> Nongovernmental royalty owners who, during Relevant Times, received payments based on production from an XTO-operated well for which the production is processed in Timberland's Tyrone natural gas processing plant.
>
> > a. *Kansas Subclass*. Members of the Timberland Class who receive royalties from at least one well located in Kansas.
> >
> > b. *Oklahoma Subclass*. Members of the Timberland Class who receive royalties from at least one well located in Oklahoma.
>
> As used in the class definitions, "Relevant Times" means the following: (1) for members of the Kansas Subclass, for a period of at least as early as March 25, 1997 to present; (2) for members of the Oklahoma Subclass, (a) for a period from July 1, 2002 to present for those bound by the Booth settlement, and (b) for a period from March 25, 1997 to present for those who opted out of the *Booth* settlement.

(Dkt. 50-5, at 17). The plaintiffs in *Beer* sought an accounting "to ensure that they have been paid the proper price" for gas from their wells, (Dkt. 50-4, at ¶ 6), alleging that XTO had breached its obligation to "bear the expense to bring [the gas it produced] to a marketable condition" by improperly subtracting for various expenses (*id*. at ¶ 7), and that it had obtained an unfairly low price for the gas by "intracompany sales." (*Id*. at ¶ 8).

Roderick Trust submits five arguments in opposition to dismissal. First, the plaintiff argues that the first-to-file rule should not apply at all given that XTO seeks only a *partial* dismissal, and notes that XTO cites no authority for the rule's application under such circumstances. They argue that, effectively, XTO's motion is a premature attempt to reduce the prospective class by excluding the *Beer* claimants.

Second, Roderick Trust argues that the motion invoking the protection of the first-to-file rule should have been filed in Oklahoma, and is not properly advanced here. Citing decisions such as *Johnson v. Pfizer, Inc.*, Case No. 04-1178, 2004 WL 2898076, *2 (D. Kan. Dec. 10, 2004), it contends that only the first court should decide whether to apply the first-to-file rule.

Third, the Trust argues that XTO is not entitled to the equitable relief which underlies the first-to-file rule, since it essentially failed to adequately inform the *Beer* court of the nature of this litigation.

Fourth, the Trust contends that the two actions are not substantially similar, because the present action involves many more claimants (since the *Beer* action is restricted to royalty owners served by XTO's Tyrone Plant in Timberland, Oklahoma), but also additional claims not present in *Beer* (since the claim in that action is restricted to the issue of subsidiary-pricing).

Finally, as an alternative argument, the Trust contends that even if the court determines that the first-to-file rule applies, the court should transfer the action to the Northern District of Oklahoma rather than dismiss the action.

The first-to-file rule is a "well-established doctrine that encourages comity among federal courts of equal rank." *Zide Sport Shop of Ohio v. Ed Tobergte Assocs.*, 16 Fed.Appx. 433 (6th Cir.2001). In determining whether the first-to-file rule applies, the court should examine the chronology of the actions, the similarity of the parties involved, and the similarity of the issues at stake. *Versus Tech v. Hillenbrand Indus.*, No. 04-CV-168, 2004 WL 3457629 (W.D.Mich. Nov. 23, 2004).

The Tenth Circuit applies the first-to-file rule, which "permits a district court to decline jurisdiction where a complaint raising the same issues against the same parties has previously been filed in another district court." *Buzas Baseball, Inc. v. Bd. of Regents of the Univ. of Ga.*, 189 F.3d 477 (table), 1999 WL 682883, at *2 (10th Cir. Sept.2, 1999); *see Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1163 (10th Cir.1982); *Cessna Aircraft Co. v. Brown*, 358 F.2d 689, 692 (10th Cir.1965). The parties only need be substantially similar for the rule to apply. *See Ed Tobergte Assocs. v. Zide Sport Shop*, 83 F.Supp.2d 1197, 1198 (D.Kan.1999); *Graphic Tech., Inc. v. McDonald's Operations Assn.*, No. 00-2349-GTV, 2000 WL 1920034, at *1 n. 2 (D.Kan. Dec.21, 2000).

The court finds that the issue is properly before the court. The cases cited by the Trust merely establish that the *preference* is for the court of first-filing to decide the application of the rule. Thus, the plaintiff correctly quotes *Johnson v. Pfizer*, 2004 WL 2898076 at *2 (D. Kan. Dec. 10, 2004) to the effect that the case law "overwhelming[ly] support[s] the assertion that the court in a second-filed case should not determine the initial question of which court applies the first-to-file rule." That this was not the end of the matter, however, is plain from the remainder of the decision, in which the court further observed that "[b]ecause jurisdiction attached to the District of New Jersey before it attached to this court, the District of New Jersey would *normally* be the court to apply the first-to-file rule and its exceptions." (Emphasis added). The *Johnson* court wrote that "The Tenth Circuit applies the first-to-file rule, which 'permits a district court to decline jurisdiction where a complaint raising the same issues against the same parties has previously been filed in another district court.'" *Id.* at *2 *(quoting Buzas Baseball, Inc. v. Bd of Regents of the Univ. of Ga.*, 189 F.3d 477 (table), 1999 WL 6822883 at *2 (10th Cir. Sept. 2, 1999)). The court thus explicitly recognized that the second court may exercise its discretion to enforce the rule.

And indeed the *Johnson* court ultimately decided to enforce the rule, holding that it would "reluctantly follow the first-to-file rule and will stay this case" pending resolution of the issues in the New Jersey action. *Id.* at *5. Additionally, there are numerous decisions by second-filed courts applying the first-to-file rule in cases involving class actions. *See, e.g., Peak v. Green Tree Finan'l Serv'ng.*, No. 00-0953-SC, 2000 WL 973685 (N.D. Cal. July 7, 2000); *Walker v. Progressive Cas. Ins.*, No. C03-656R, 2003 WL 21056704 (W.D. Wash. May 9, 2003). Thus, while the first-to-file rule is generally enforced by the first court, "the second district court has discretion to transfer, stay, or dismiss the second case in the interest of efficiency and judicial economy." *Cedars-Sinai Med. Ctr. v Shalala*, 125 F.3d 765, 769 (9th Cir. 19997). Accordingly, the court finds that the issue has been properly presented for its consideration.

Nor is the fact that the plaintiff seeks a partial dismissal here grounds for avoidance of the first-to-file rule. The first-to-file rule "normally serves the purpose of promoting efficiency well and

should not be disregarded lightly." *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 750 (9th Cir.1979). Plaintiff cites no case law supporting the conclusion that the first-to-file rule has no application unless the entirety of the second-filed case is dismissed. While the purpose of the first-to-file rule – maximization of judicial economy – is most strongly in play when the second-filed case is a complete subset of the earlier action, that interest remains important in other cases. It serves no valid judicial interest to maintain two substantially identical claims by two plaintiff classes in separate courts, merely because some additional claims have been added to the second-filed case.

The Trust next argues that the court should not resolve the first-to-file issue, since XTO has behaved inequitably. In particular, it cites language from a footnote in the *Beer* certification decision:

> The court takes judicial notice that a putative class action is currently pending in the District of Kansas against defendant. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc*., Case No.08-1330-JTM (D. Kan. filed Oct. 24,2008). In the Kansas action, plaintiff contends defendant underpaid royalties by taking improper deductions and failing to obtain the best reasonable price. It is unclear whether the price claims in the Kansas case overlap the claims in this case. The court notes, however, that defendant – the party most familiar with the allegations in both cases – has not argued that the Kansas case presents the same issues.

*Beer v. XTO Energy*, Slip op., at 16, n. 11, No. 07-798-L, (W.D. Okla. March 24, 2009).

The court finds that XTO has not behaved with such inequity that the court should tolerate the maintenance of two separate actions in separate states alleging substantially similar claims. In *Beer*, the motion for class certification was filed May 7, 2008, the decision rendered on March 24, 2009. But the hearing was held on October 6, 2008, only shortly before this action was filed on September 18, 2008. Further, XTO was not served with the class action petition in this case until September 24, 2008, just two weeks before the *Beer* class certification hearing. Further yet, the citation from the *Beer* certification decision does not show any active misrepresentation by XTO; given the timing of the pleadings in the two cases, XTO was unlikely to have had any information about the Kansas claims beyond the Complaint itself – information which was also available to the Oklahoma court.

Roderick Trust cites several decisions noting that the first-to-file rule may be denied under certain circumstances. See *Nacogdoches Oil & Gas, v. Leading Solutions*, No. 06-2551-CM, 2007 WL 2402723, *2 (D. Kan. Aug. 17, 2007) (a court may suspend application of the first-to-file rule for "bad faith, anticipatory filing, and forum shopping"); *City of Columbus v. Hotels.com*, 2007 WL 2029036, *4 (S.D. Ohio July 10, 2007) (noting that the first-to-file rule "is discretionary" and may be denied based upon "'extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping'" (*quoting Zide Sport Shop of Ohio v. Ed Tobergte Assoc.*, 16 Fed. Appx. 433, 437 (6th Cir.2001))). Notably, however, none of the cited decisions defines or even involves such inequitable conduct. *See Columbus*, 2007 WL 2029036 at *4 (acknowledging that "[p]laintiffs do not contend that any of these factors exist"). To the extent these and other cases address equitable exceptions to the first-to-file rule, they generally involve instances of "anticipatory filing" in which a plaintiff has stolen a march to race to the courthouse door.

Here, the Oklahoma action was filed by the *Beer* plaintiffs, not XTO, and there is absolutely no indication that XTO had any motive to mislead the Oklahoma court as to the nature of the present action, filed only days before the certification hearing in *Beer*, and there is no substantial reason to deny application of the first-to-file rule if the elements of the rule are met.

Turning to the merits of XTO's first-to-file argument, the court finds no grounds for concluding that the two claims are not substantially similar. The plaintiff argues that the present action cannot be substantially similar to the *Beer* case, since the number of claimants involved is greater and this case involves types of claims not presented in *Beer*. But the first-to-file rule does not require identity of claims, since "there need be only substantial overlap for the actions to be duplicative and to thus implicate the first-to-file rule." *Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp.2d 686, 688 (E.D. Tenn. 2005). *See also Ed Tobergte Assocs. v. Zide Sport Shop*, 83 F.Supp.2d 1197, 1198 (D.Kan.1999) (rule requires only substantial identity); *Graphic Tech., Inc. v. McDonald's Operations Assn.*, No. 00-2349-GTV, 2000 WL 1920034, at *1 n. 2 (D.Kan. Dec.21, 2000). That the claims here are substantially similar to those in *Beer* is in fact acknowledged by

plaintiff 's observation that *Beer* is "simply a subset of the Roderick Case." (Dkt. 70, at 1). This argument effectively concedes that for a substantial component of this case – the Tyrone plaintiffs' claims for subsidiary pricing – the claims in *Beer* are indeed identical.

In the *Beer* certification order, the court noted that the plaintiff class alleged as a common issue the claim that XTO improperly "determines its royalty payments for all members of the class based on the same formula and one of the key components of that formula - the price - is based on a transaction between affiliated companies, which is not proper under either Oklahoma or Kansas law." (Dkt. 50-5 at 9). In its Second Amended Complaint, the *Beer* plaintiffs asserted, in addition to the affiliate pricing claim, the contention that XTO "inappropriately subtracts sums from amounts paid to producers in ways which cause the underpayment of royalties." (Dkt. 50-4, at ¶ 7).

In the present case, the plaintiff initially alleged that XTO "failed to properly account to the royalty owners and underpaid royalty owners by taking numerous deductions before the gas products were in marketable condition and for not obtaining the highest and best reasonable price by selling to one or more affiliates." (Dkt. 50-2, at ¶ 4). The Amended Complaint filed by plaintiff alleges that XTO made improper deductions by violating the Marketable Condition provision of the leases, and that it "should have paid for gas at arm's length prices not affiliate sale prices." (Dkt. 37, at ¶ 14k).

The court finds that the first-to-file rule applies to the claims advanced by the Tyrone plaintiffs, and the remaining question is whether those claims should be dismissed or transferred. The plaintiff argues that the court should transfer the affected claims rather than dismissing the case, citing various decisions. XTO responds that the court should not transfer the affected claims, because the present case is so much larger than *Beer*, and because the plaintiff itself chose to file this action in Kansas only two weeks before the *Beer* certification hearing.

Courts rarely dismiss claims pursuant to the first-to-file rule, preferring instead to transfer those claims to the court where the similar claims were first filed. *See Steavens v. Electronic Data Sys. Corp.*, No. 07-14536, 2008 WL 5062847, at *2 (E.D. Mich. Nov. 25, 2008) (*citing Elite Physicians Servs., v. Citicorp Credit Servs.*, No. 1:06-cv-86, 2007 WL 1100481, at *5 (E.D.Tenn.

Apr.11, 2007)). Consistent with this preference, the plaintiff suggests that the court transfer the entire action to the Western District of Oklahoma. (Dkt. 70, at 23).

The court concludes that transfer of the entire action is unjustified. The cases supporting transfer cited by plaintiff involved transfers of claims which were identical to (*Allen v. Rohm and Haas Co. Ret. Plan*, No. 3:06-CV-25-S, 2006 WL 1980174, at *2 (W.D. Ky. July 10, 2006)), or a mere subset of the first-filed claims (*Steavens v. Electronic Data Sys. Corp*., No. 07-14536, 2008 WL 5062847, at *2 (E.D. Mich. Nov. 25, 2008) (FLSA violation class in Southern District of New York "subsumes this putative class"), or the transfer of actions where the first-filed claims were not significantly more advanced. *Fuller v. Abercrombie & Fitch Stores, Inc*., 370 F. Supp.2d 686, 689 (E.D. Tenn. 2005) (first action filed six months before second); *SPEC Int'l, Inc. v. Patent Rights Prot. Group*, No. 1:08-cv-662, 2009 WL 736826, at *1-2 (W.D. Mich. Jan. 9, 2009) (less than two months).

In the present case, the *Beer* action is several years ahead of the present litigation and has already received class certification. Further, as the plaintiff itself has stressed, this action is "**approximately six times**" larger than the 200 or so wells at issue in *Beer*. (Dkt. 70, at 5) (Emphasis by plaintiff). Transfer is both unjustified and unnecessary, as the Tyrone plaintiffs are already represented in the *Beer* class. Accordingly, the court will grant the motion to dismiss.

**Summary Judgment**

XTO has moved for summary judgment as to claims advanced by the prospective plaintiff class which would replicate claims previously advanced and settled in two prior certified class actions, *Booth v. Cross Timbers Oil Co.*, Case No. CJ-98-016, and *Burkett v. J. M. Huber Corp*., Case No. 04-CV-255, which raised similar claims in Colorado. Both cases involved claims of royalty under payments by XTO. In *Booth*, the claims arose from Oklahoma production from 1993 to 2002. In *Burkett*, the claims arose from production in La Plata, County, Colorado from 1998 to

2005. In both cases, the respective courts approved a settlement agreement and a full release of the claims advanced, and then dismissed the actions with prejudice. Both actions were certified as class actions pursuant to the state equivalent of Fed.R.Civ.Pr. 23(b). 12 Okla.Stat. § 2023(b)(3).

Here, plaintiff seeks the creation of a class of royalty owners of XTO from wells in Colorado, Kansas, and Oklahoma for production from January 1, 1999 to the present time. (Dkt. 37 at ¶ 10). XTO argues that the claims are barred by the doctrines of *res judicata* and release. It notes that under the laws of the respective states, the prior class action settlement agreements are interpreted by the court as a matter of law, *Ringquist v. Wall Custom Homes*, 176 P.3d 846, 849 (Colo. App. 2007) ("interpretation of a settlement agreement, like any contract, is a question of law that we review de novo"); *Corbett v. Combined Communic'ns Corp.*, 654 P.2d 616, 617-18 (Okla. 1982) (interpretation of an unambiguous settlement agreement is a matter of law), and argues that the pleadings from *Booth* and *Burkett* are sufficient basis a finding by summary judgment that the plaintiffs' claims have been released.

The plaintiff has responded by filing a motion pursuant to Fed.R.Civ.Pr. 56(5) seeking more time to respond to XTO's motion. Citing *Pelt v. Utah*, 539 F.3d 1271 (10th Cir. 2008) and *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the plaintiff argues that the court cannot give *res judicata* effect to *Booth* and *Burkett* in the absence of a full review of both cases. It further argues that the earlier releases do not arise from the same set of facts and *res judicata* has no application. It seeks extensive discovery on the claims in *Burkett* and *Booth* beyond the public pleadings and transcripts that it has already obtained. (*Id*. at 25). The plaintiff complains that the *Booth* action was settled "on much less favorable terms" since additional claims involving claims for affiliate sales or natural gas liquids (NGLs) were also relinquished. (Dkt. 81, at 14). The plaintiff seeks production of the original depositions and exhibits in the *Booth* and *Beer* cases, all correspondence between the parties in those actions, depositions of key XTO officers, and other information allowing them to

make "calculation of what the total damages" which were actually sustained in the earlier action. (Dkt. 81, at 19-20 and n. 12).[3]

The court finds that the facts set forth by XTO are uncontroverted, and XTO has satisfied its burden of demonstrating the existence of prior decisions which would bar some of the claims by the present proposed class under the doctrine of *res judicata*, and finds the application of that doctrine is consistent with due process. The court further finds that the discovery proposed by plaintiff would essentially require the wholesale retrial of two prior class actions, and this result is not compelled or supported by the requirements of due process recognized in *Shutts* and *Pelt*. Additional time for a response is unnecessary, since the requested discovery is irrelevant to the court's inquiry. Further, in its Rule 56(f) motion the plaintiff has otherwise responded fully and directly to the merits of XTO's summary judgment motion, arguing at length that the requirements for *res judicata* are not met, and the court finds that under the circumstances of the case, plaintiff's Rule 56(f) motion can and should be considered as the plaintiff's response to the defendant's motion for summary judgment. *See Gieringer v. Silverman*, 731 F.2d 1272, 1280 (7th Cir. 1984).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

---

[3]Plaintiff also acknowledges that the issue itself ultimately may be moot, as plaintiff observes in its Rule 56(f) motion that the ultimate Class Definition will "likely be amended to delete the 100 wells covered by the *Burkett* settlement." (Dkt. 81, at 14 n. 6; *cf*. Dkt. 54-9 at 5, 8 *with* 55-4 at 8). But court finds no just release for any delay in the application of *res judicata*, as the relevant motions are ripe for ruling and no sufficient reason presented for a delay in ruling.

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Booth*, the plaintiff class agreed to a Settlement Agreement which was subsequently incorporated into the final judgment under which the class released all claims

> any and all claims, ... demands, ... contracts, ... causes of action of any kind or nature, which Class Representatives, Class Counsel or any member of this Plaintiff Class have had or may now have arising out of or in anyway associated with the acts alleged or which could have been alleged in the Class Action Litigation, ... the deduction of expenses in computing royalty payments, the taking into account of expenses in computing the proceeds, value or other sums on which royalty is paid, ... reporting and/or non-reporting of such expenses, ... the under-payment or non-payment of such royalties, ... in tort or contract, ... which in any manner relate to Post Production Costs, ... sales by and/or to affiliated or related entities of XTO; failure to obtain the highest price reasonably available for the sale of gas from the Plaintiff Class wells, ... failure to pay interest on production revenues ... claims for breach of express and implied duties of oil and gas leases, ... unjust enrichment, accounting, and all other claims and/or damages relating to Post Production Costs....

(*Booth* Set. Agr. at ¶ 1.13). In approving final judgment on April 25, 2003, the Dewey County District Court specifically found that the notice had been mailed to all members of the *Booth* Plaintiff Class who could reasonably be identified and that the mailing and publication "constituted

valid, due, and sufficient notice to all Plaintiff Class Members, and complied fully with 12 O.S. § 2023, the United States Constitution, the Oklahoma Constitution and any other applicable law." (Dkt. 54-2, at ¶ 5). Thirty interest owners had opted out of the litigation. For the remainder, the court found that

> Those Plaintiff Class members who have not filed timely and valid requests for exclusion from the settlement are bound by this Order, the Plan of Allocation, the Final Judgment in this action and by the terms of the Settlement Agreement to the fullest extent permitted by law.

(*Id*. at ¶ 7). The court conducted a separate fairness hearing in which it "considered all submissions made in connection with the proposed Settlement including all oral and written comments and/or objections received from the Settlement Class members," and subsequently "reviewed and considered the evidence, files and records" prior to approving the settlement. (*Id*. at 2). The court found that the Settlement Agreement "is the result of good faith arms-length negotiations by the parties thereto" and that it was "fair, reasonable and adequate in all respects to the Settlement Class members." (*Id*. at ¶ 8). It also specifically found that the class representatives had fairly and adequately protected the interests of the plaintiff class, and that the claims of the class representatives were typical of the claims of the plaintiff class. The court concluded:

> IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
> ....
> 11. To the fullest extent permitted by law, all of the Released Claims of the Settlement Class against XTO and Released Parties are dismissed on the merits and with prejudice....
>
> 12. To the fullest extent permitted by law, all Settlement Class members shall conclusively be deemed to have released and forever discharged XTO and the Released Parties from all Released Claims, and all Settlement Class members shall forever be enjoined and barred from asserting, instituting, or prosecuting, in any capacity, before any court or governmental agency, any action or proceeding against XTO and/or the Released Parties that involves or asserts any of the Released Claims.

(Id. at 6-7.) The court also held that the Final Judgment and Settlement Agreement should not generally be "offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding" but specifically excepted and allowed such use "in any action by XTO, or in any action against XTO by any Settlement Class member, or in any action against the

Settlement Class, or any of them, to support a claim or defense of *res judicata*, collateral estoppel, release, full faith and credit, or other theory of claim preclusion, issue preclusion, or similar claim or defense." (Id. at ¶ 10). The court reserved exclusive and continuing jurisdiction to supervise and enforce any matters related to the Settlement Agreement and the Final Judgment.

In support of the settlement, XTO issued settlement checks to approximately 9,901 *Booth* settlement class members for over $1,628,981.00 after fees and expenses in accordance with the Plan of Allocation and the Final Judgment. In addition, XTO issued a check to Class Counsel for $885,312.55 in attorneys fees, costs and expenses

The Colorado District Court in La Plata County entered a final judgment in *Burkett v. J.M. Huber Corp.* on June 21, 2005. The court certified the class action under Colo.R.Civ. Pr. 23(b)(3), defining the class as

> All royalty owners, including overriding royalty interest owners, who have been entitled to receive royalty payments under oil and gas leases located in La Plata County, Colorado, owned in whole or in part, or operated by J.M. Huber Corporation and later by XTO Energy Inc. ("Defendants") at any time during the period September 22, 1998, through the present.

(Dkt. 52-8, at 2).

> The Settlement Agreement included

> Any and all claims ... rights ... that might have been asserted prior hereto or in the future, directly, representatively, derivatively, or otherwise by the members of the Plaintiff Class based on any ... omissions, failures to act, conflicts of interest, tortuous acts ... acts of unjust enrichment, breaches of express provisions, breaches of implied covenants or any other duties arising under the leases ... or breach of other statutory or common law duties ... which were or could have been alleged by the Class Representatives on behalf of the Plaintiff Class arising from Deductions by Defendants

.
(Dkt. 52-9, at ¶ 1.25). In *Burkett,* "Deductions" were defined as "[a]ny monetary or volumetric deduction taken by Defendants in calculating and paying royalty." (*Id*. at ¶ 1.6). The Settlement Agreement incorporated these definitions. (Dkt. 52-8, at 4). The *Burkett* Settlement Agreement stated that the class members shall be deemed to have "dismissed the Action against Defendants with prejudice as to the Settled Claims," and "acknowledged full and complete satisfaction of, and

fully, finally and forever settled, released and discharged the Settled Claims against Released Parties." (Dkt. 52-9, at ¶ 9.2.)

In issuing its final order, the court found that the content of the notice to class members and its manner – notice by mail to all identifiable class members coupled with publication notice – "comply with due process and with C.R.C.P. 23." (Dkt. 52-8 at 4.) The notice provided for prospective class members to opt out of the litigation and eleven interest owners did so.

The court conducted a fairness hearing and took into account matters contained in the court file, heard statements of counsel, and was advised by certain Class Representatives concerning the proposed settlement. (*Id*. at 3.) The court found that the claims of the class representative were typical of the claims of the plaintiff class, and that the class representative would fairly and adequately protect the interests of the plaintiff class. The court found that "[t]he prerequisites to maintain this action as a class action as set forth in C.R.C.P. 23(a)[and] 23(b)(3) are met." (*Id*. at 3.)

Based on its review of the entire record in the case, the Court determined that the Settlement should be approved, and held that the agreement "was arrived at through arms-length and vigorous and extensive negotiations" and that it had been "arrived at in good faith and was based on a realistic appraisal by the parties and their counsel of the difficulties inherent in a case of this magnitude and complexity." (*Id*. at 5). The court further found that "[b]ased upon the evidence presented, the argument of counsel, and the entire record of this case, the Court concludes that the Settlement Agreement is fair, adequate and reasonable." (*Id*. at 6.) The court reserved exclusive and continuing jurisdiction to supervise and enforce any matters related to the Settlement Agreement and the Final Judgment. The court concluded:

> The Settled Claims through the date of this Judgment are fully and completely settled, discharged, and released. Upon XTO's issuance of the Distribution Checks, Settlement Class members are deemed conclusively to have released and settled the Settled Claims. All such members of the Plaintiff Class are barred and permanently enjoined from commencing or prosecuting either directly, representatively, derivatively or in any capacity, any of the Settled Claims against the Released Parties.

(*Id*. at 7).

In compliance with the settlement, XTO issued checks to 563 royalty owners for over $3.7 million after fees and expenses. In addition, XTO issued a check to Class Counsel for $1,299,668.46 in attorneys' fees and expenses.

"Representative suits with preclusive effect on nonparties include properly conducted class actions." *Taylor v. Sturgell*, ___ U.S. ___, 128 S.Ct. 2161, 2172-73, 171 L.Ed.2d 155 (2008). For purposes of *res judicata*, adequate representation does not exist unless there were either "special procedures to protect the nonparties' interests" or "an understanding by the concerned parties that the first suit was brought in a representative capacity." *Taylor*, 128 S.Ct. at 2174 (*citing Richards v. Jefferson County*, 517 U.S. 793 (1996)).

As the Tenth Circuit observed in *Pelt*:

> It is well settled that a class action judgment is binding on all class members. *See Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940). It is also well settled that a class action judgment will not bind absent members if they were not accorded due process of the law. *Id.* at 41, 61 S.Ct. at 115. The preclusive effect of a prior judgment will depend upon whether absent members were "in fact" adequately represented by parties who are present. *Id.* at 42-43, 61 S.Ct. at 118.

539 F.3d at 1284. The due process requirement of adequate representation exists "at all times" throughout the litigation. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

Further, as plaintiff correctly stresses, the decision of the court adjudicating the earlier class action cannot by itself "predetermine the *res judicata* effect of its own judgment; that can only be determined in a subsequent suit." *Id.* at 1285 (citing *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 878 (1st Cir.1977). At the same time, however, rulings by the earlier court are not irrelevant to that subsequent review, since "'if the matter [of the scope of its ruling] is carefully considered,'" by the earlier court, "'questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered.'" *Id.* (*quoting* Advisory Comm. Note to 1996 Am. to Fed.R.Civ.Pr. 23, 39 F.R.D. 98, 106 (1966))

The *Pelt* court noted the standards for adequacy of representation could be stringent:

> The standard for evaluating adequacy of representation in a class action suit was discussed by the Fifth Circuit in *Gonzales* [*v. Cassiday*, 474 F.2d 67, 72 (5th Cir. 1973)], where the court established a two-prong test to determine whether adequacy

of representation was satisfied: "(1) [d]id the trial court in the first suit correctly determine, initially, that the representative would adequately represent the class? and (2)[d]oes it appear, after termination of the suit, that the class representative adequately protected the interest of the class?" 474 F.2d at 72. The first question involves a collateral review of the trial court's determination to permit the suit to proceed as a class action, while the second involves a review of "the class representative's conduct of the entire suit-an inquiry which is not required to be made by the trial court but which is appropriate in a collateral attack on the judgment...." *Id.* The court held that the

> primary criterion for determining whether the class representative had adequately represented his class for purposes of res judicata is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class. A court must view the representative's conduct of the entire litigation with this criterion as its guidepost.

*Id.* at 75. The adequacy inquiry following final judgment "necessarily requires a hindsight approach to the issue of adequate representation, and in no way reflects on the [district] court's conclusion [at the outset] that the [class representative] would adequately represent the class." *Id.* at 73 n. 11. After consideration of these standards, the *Gonzales* court concluded that the representative's failure to appeal an order denying retroactive relief to all class members except the representative constituted inadequate representation of the class. *Id.* at 75-76.

539 F.3d at 1285.

The court also recognized that the *Gonzales* standard had not been previously adopted in this Circuit, but noted the holding adopted in *Garcia v. Board of Educ'n*, 573 F.2d 676, 680 (10th Cir. 1978) was "similar[]" to *Gonzales*. In *Garcia*, a school desegregation class action was held to be subject to the *res judicata* effect of an earlier class action, the court stating that "[t]he question of adequate representation can best be resolved by determining whether the interests of those who would attack the judgment were vigorously pursued and protected in the class action by qualified counsel." 573 F.2d 676, 680 (10th Cir.1978) (citing *Gonzales*, 474 F.2d at 75). The court held that the standard of adequate representation was satisfied on the facts of the case:

> The fact that the *Keyes* litigation went on for seven years is evidence in itself that it was a hard-fought contest. The desegregation plan that was ultimately adopted by the district court was one developed by the court's own expert. The court rejected each of the parties' plans as being too one-sided. Plaintiffs' argument that their interests were not identical with all those of the plaintiff class in *Keyes* does not preclude the application of res judicata. Where, as we have already shown, substantially all of plaintiffs' interests were vigorously presented in the litigation by the various parties,

there is no justification for allowing the litigation to be effectively reopened at this time.

573 F.2d at 680 (citation omitted).

Applying this standard to the case before it, the *Pelt* court affirmed the decision of the district court that the plaintiff class was not barred by the results of two prior class actions, where both prior cases had been dismissed for failure to prosecute after the issuance of a show cause order.

Notably, however, the *Pelt* court twice distinguished cases which involved the preclusive effects of an earlier Rule 23(b)(3) class action. After first acknowledging the "demanding *Gonzales* formula," the Tenth Circuit also acknowledged that it had previously distinguished that decision.

> We have distinguished *Gonzales*, which permitted a Rule 23(b)(2) collateral attack, from class actions certified under Rule 23(b)(3). There are no mandatory notice requirements in subsections (b)(1) and (b)(2) actions, and members do not have the opportunity to opt out of the class, opportunities accorded to subsection (b)(3) class members. *See In re Four Seasons Sec. Laws Litig.*, 502 F.2d 834, 842, n. 9 (10th Cir.1974). "As a result of these distinctions class members in (b)(1) and (b)(2) actions must necessarily rely on the representative to protect their interests." *Id.* (quoting *Gonzales*, 474 F.2d at 74 n. 12). "Therefore, the propriety and adequacy of representation accorded to absent class members by the named parties in (b)(1) and (b)(2) actions should be critically evaluated before their rights are foreclosed." *Grigsby v. N. Miss. Med. Ctr.*, Inc., 586 F.2d 457, 461 (5th Cir.1978).

539 F.3d at 1285-86.[4]

Later, the court responded to defendant's arguments that a contrary ruling would require "'second guess[ing]' class counsel's litigation strategy and tactics" and that "even a class representative's decision to abandon a claim is not *per se* inconsistent with adequate representation." *Id.* at 1288. The court carefully distinguished the relinquishment of a claim by settlement, and the extraordinary and inexplicable abandonment of the earlier class actions present in *Pelt*.

> Utah is correct that in the context of settlement, abandonment of claims can be a reasonable litigation tactic that does not necessarily support a finding of inadequate representation, citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96,

---

[4]On the basis of a footnote contained in a decision by the Delaware Supreme Court, *Prezant v. De Angelis*, 636 A.2d 915, 924 n. 6 (Del. 1994), the plaintiff suggests that *Four Seasons* should no longer be considered valid law after *Shutts*. However, *Pelt* court's favorable citation *Four Seasons*, clearly suggests that the Tenth Circuit considers that decision valid in the wake of *Shutts*.

109-113 (2d Cir.2005). **The *Wal-Mart* case was a Rule 23(b)(3) case, however, and plaintiffs were given notice and the opportunity to object to the proposed settlement. *Id.* at 102-103. Plaintiffs' claim of inadequate representation was rejected by the Second Circuit as akin to a challenge to the adequacy of the settlement, rather than due process**. *Id.* at 112. By contrast, the [earlier] accounting claims were not abandoned in the context of settlement, but rather, were simply dismissed for failure to prosecute. Unlike class members in a settlement, the plaintiffs received nothing in exchange for abandonment of those claims.

*Id.* (Emphasis added.)[5]

The court concluded by stressing that its holding was triggered by "[t]he unique factual situation" presented by the abandonment of the earlier accounting claims. It stated:

we recognize the importance of finality of judgments and do not read the adequacy of representation inquiry as requiring second-guessing of every litigation decision. As one court succinctly stated, "[d]ue process entitles class members to notice and to adequate representation. It does not entitle them to continue to challenge the defendant's conduct until they are ultimately successful." *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D.Tex.1979).

The court finds that the wholesale reexamination of the results of *Burkett* and *Booth* advocated by plaintiff to be precisely the sort of "second-guessing of every litigation decision" which the *Pelt* court stated was not a requirement of due process. Both of the Tenth Circuit's decisions in *Pelt* and *Garcia* were resolved by an independent review of the results obtained as exemplified by the pleadings in the earlier litigation. In neither case did the court require independent depositions from parties to the earlier action in an attempt to determine if the terms of the settlement were on "less favorable terms."

In *Pelt*, the court was able to determine that the due process requirement of adequate representation was not satisfied where the earlier class action counsel had inexplicably abandoned a contest they were in the process of winning.[6] In contrast, In *Garcia*, the court found that the

---

[5]*See also Caruso v. Candie's, Inc.*, 201 F.R.D. 306, 312 (S.D.N.Y. 2001) (noting the existence of "basic differences" between Rule 23(b)(3) class actions and other types of class actions as to mandatory notice requirements and opt out opportunity, and noting the Tenth Circuit's distinguishing of *Gonzales* in *Four Seasons*).

[6]As mentioned earlier, the *Pelt* court noted the Fifth Circuit's decision in *Gonzales*, where the court had refused to give *res judicata* effect to a prior class action because the class representatives – without any justification – failed to appeal the judgment thereby depriving the

requirements of due process were met based upon a review indicating simply that the earlier litigation had proceeded for some time, was vigorously contested, and that the court exercised independent judgment in reaching a settlement.

The court has here reviewed extensively the litigation in both *Burkett* and *Booth*, and finds that in both cases the matters were vigorously and effectively contested by counsel and proceeded to results favorable to the plaintiff class. In both cases, the relevant courts exercised their independent judgment fairly on the basis of an independent examination of the evidence and the submissions of the parties. The courts found the Rule 23(b)(3) notices were adequate and consistent with due process, and the interests of the class were protected by the vigorous representation by class counsel. This court's review of the records in both cases confirms this conclusion, and the court finds that the notices issued in *Booth* and *Burkett* were adequate to notify the proposed class as to the claims involved, that these claims arise from the same set of facts implicated in the present action, and that the courts rendered fair and appropriate settlements based on all actual or potential claims arising from those facts.

Further, both decisions were rendered after finding that the classes were properly certified pursuant to the relevant state versions of Rule 23(b)(3), and the Tenth Circuit's decision in *Pelt* suggests that Rule 23(b) procedures play an important role in ensuring the existence of due process. *See Taylor v. Sturgell*, ___ U.S. ___, 128 S.Ct. 2161, 2176, 171 L.Ed.2d 155 (2008) (minimum requirements for adequate representation in terms of alignment of interests, protection of interests, and notice "are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23"). The plaintiff has presented no authority withholding the application of *res judicata* to a prior Rule 23(b)(3) class action settlement based upon a subsequent reweighing of the value of the terms of the settlement.

The court will accordingly grant the defendant's motion for partial summary judgment as to the class members' claims settled in *Booth* and *Burkett*, as such claims are barred by both the

---

class of complete relief. *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir.1973).

doctrines of *res judicata* and settlement, the class members having released such claims pursuant to the settlement agreements. This is true even though some of the claims advanced by plaintiffs here are marginally different from the claims identified in *Booth* and *Burkett*.

As the Supreme Court has observed, in order to accomplish a full and effective settlement and thereby "'" prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."'" *Matsushita Electric Indus. Co. v. Epstein*, 516 U.S. 367, 376-77 (1996) (quoting *Nottingham Partners v. Dana*, 564 A.2d 1089, 1106 (1989) (quoting *TBK Partners v. Western Union Corp.*, 675 F.2d 456, 460 (C.A.2 1982))). As a result, "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (citations omitted).

The plaintiff argues that *Booth* and *Burkett* did not separately advance certain claims, such as those advanced here for the alleged "failure to pay for NGLs, condensate, helium and nitrogen" or for "affiliate pricing," and thus denominates these as "Unlitigated Claims" which should not be deemed released. But the identical factual predicate rule does not require that claims be pled or litigated to be released. *See Wal-Mart*, 396 F.3d at 108. The factual predicate here – the claimed underpayment of royalties allegedly owed by XTO under oil and gas leases – is identical to that in *Booth* and *Burkett*. The same leases underlie all of the royalty owners' claims. The nature of those leases and the obligations of XTO as the lessee were the heart of the action in *Burkett* and *Booth*, and they are the heart of this action. The putative "Unlitigated Claims" arise from same factual predicate as the *Booth* and *Burkett* claims, and were effectively released in those cases. The court finds that XTO is entitled to summary judgment on the claims at issue here that were released by the *Booth* and *Burkett* settlement agreements.

IT IS ACCORDINGLY ORDERED this 11th day of January, 2010 that the defendant's Motion to Dismiss (Dkt. 47) and plaintiff's Rule 56(f) Motion (Dkt. 80) are denied; defendant's Motion to Dismiss (Dkt. 49) and for Summary Judgment (Dkt. 53) are granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE