IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WALLACE B. RODERICK REVOCABLE LIVING
TRUST, TRUSTEE WALLACE B. RODERICK,
 ON BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED,

                 Plaintiff,

                 vs.                      Case No. 08-1330-JTM

XTO ENERGY, INC.
 (INCLUDING PREDECESSORS, SUCCESSORS
 AND AFFILIATES),

                 Defendant.

MEMORANDUM AND ORDER

Defendant XTO Energy, Inc. produces natural gas and related chemical products from wells located in Kansas. The plaintiff Wallace B. Roderick Revocable Living Trust ("Roderick") alleges that XTO has cheated royalty owners by, among other things, deducting from their payments the costs of rendering the gas marketable, in violation of Kansas law. XTO denies the allegation.

The matter is now before the court on Roderick's Amended Motion for Class Certification. (Dkt. 172). For good cause shown, the motion for certification is hereby granted.

*Facts*

Roderick requests certification of the following class:

> All royalty owners of XTO Energy, Inc. (and its affiliated predecessors and successors) from wells located in Kansas that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1999 to the present.
>
> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); (2) Defendant, its affiliates, predecessors, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; and (4) the claims of royalty owners as to Kansas wells gathered by Timberland and processed at the Tyrone Plant, such claims having been dismissed by this Court based upon the certified class in *Beer* (now *Fankhouser*) *et.al. v. XTO Energy, Inc.*, Case No. CIV-07-798-L, U.S. Dist. Ct., Western District of Oklahoma (Doc. 110).

The proposed class covers wells in Kansas only. Roderick has decided to relinquish any class claims for wells located in Colorado. (Dkt. 110, at 17). In addition, the proposed class definition excludes approximately 68 wells serviced by the Timberland Gathering System, which supplies gas for processing at the Tyrone Plant in Oklahoma.

The raw natural gas produced by defendant is separated into a number of valuable products. After first separating oil and water from the gas at each well, the raw gas is metered for volume, and sampled and analyzed, and placed into a gathering line where it joins gas from other wells. Gas in the gathering line is compressed, treated, and dehydrated as it travels to the processing plant. Heavy gas molecules condense into a condensate liquid, which is collected and sold by the gatherer.

On reaching the processing plant, the gas is separated into crude helium, Y-grade or raw mix NGLs, liquid nitrogen, and residue gas. The residue gas is pressurized and placed into an interstate gas pipeline for commercial sale. Mixed NGLs are sent by a liquid pipeline to a fractionation plant, where they are segregated and made available for commercial sale. The helium is sent to a refinery for processing to commercial level Grade A helium

The plaintiff alleges that XTO does not undertake itself the burden or costs of rendering the gas into marketable condition. Rather, it alleges that XTO essentially hires third parties to accomplish this task. Under these contracts, XTO compensates the third party by (a) paying a cash fee coupled with some in-kind transfer, (b) supplying a percentage of the proceeds or an index price to pay for the gathering and process, or (c) using some combination of these methods. XTO then deducts, or "netbacks," these costs from the amounts paid to royalty owners.

There is evidence supporting the conclusion that XTO pays royalties predicated on a common methodology, which typically reflects a standard index price less a netback for charges set forth in the third party marketing contracts. Royalty owner payments are also reduced by a conservation fee. The amounts paid to individual royalty owners are all calculated using XTO's accounting system, Avatar. This system assigns each well an unique number and name. Remittances are determined by the terms contained in XTO's contract with the purchaser of the gas or gas-related product. Except for royalty owners which are a government or otherwise are tax-exempt, Avatar treats royalty owners the same. An accounting director for XTO has testified that, except for such exempt owners, Avatar does not consider "anything ... in connection with the payment of [the] royalty owner that is based ... on specific language in a lease."

The court finds that the matter is ripe for determination. The court further finds that an evidentiary hearing on the issues advanced by plaintiff's motion is not required. *See Hershey*, 2011 WL 1234883, at *14 (finding hearing not necessary given substantial evidentiary record submitted to the court) .

*1. General Principles of Class Certification*

Class certification requires that the plaintiff satisfy all four prerequisites of Rule 23(a) and at least one of the three requirements of Rule 23(b). *See Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). In resolving a claim for certification, the court must perform a rigorous analysis of the Rule 23 elements *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). The court accepts as true the allegations in the complaint, but it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may ... consider the legal and factual issues presented by plaintiff's complaints." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n. 7 (10th Cir.1999). The court should focus on the requirements of Rule 23 — not the merits underlying the class claim. *See Shook v. El Paso County*, 386 F.3d 963, 971 (10th Cir.2004). The court has broad discretion in determining whether to certify a class. *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir.2003). Class certification requirements are liberally construed, and doubts may be resolved in favor of certification. *See Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969).

This court has discussed the principles regarding class certification in many cases. *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008) (granting certification of price fixing claims brought by buyers of chemical products) (*Urethane II*); *Payson v. Capital One Home Loans*, No. 07-2282-JTM, 2008 WL 4642639 (D. Kan. Oct. 16, 2008) (granting certification of class of lender's loan consultants). The court has specifically upheld class certifications for claims raised by oil and gas ownership interests. *See Hershey v. ExxonMobil Oil*, 07-1300-JTM, 2011 WL 1234883 (D. Kan. March 31, 2011); *Arkalon Grazing Ass'n v. Chesapeake Operating*, 275 F.R.D. 325 (D. Kan., March 30, 2011); *Freebird, Inc. v. Merit Energy*, No. 10-1154-KVH, 2011 WL 13638 (D.Kan.

Jan. 4, 2011); *Eatinger v. BP America Prod'n*, 271 F.R.D. 253 (D. Kan. 2010); *Schell v. Oxy U.S.A.*, No. 07-1258-JTM, 2009 WL 2355792 (D. Kan. July 29, 2009).

Rule 23(a) sets forth four mandatory elements of all class actions:

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

The plaintiff here seeks certification pursuant to Rule 23(b)(3), which provides for certification if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## 2. Numerosity

As noted earlier, the plaintiff's proposed class definition includes all of the defendants Kansas wells, excluding wells served by the Timberland Gathering System for processing in Oklahoma, as well as certain tax-exempt royalty owners. The latter are not subject to severance taxes and have not been subjected to the fees or taxes collected from the remainder of the class.

XTO has indicated that it has more that 20,000 royalty owners for wells located in Kansas, Oklahoma, and Colorado (See Dkt. 1 at 5). XTO has an interest in 428 operated wells and 109 non-operated wells in Kansas, with some or many of the wells having more than one royalty owner.

XTO has not alleged that the proposed class is insufficiently numerous.

5

### 3. Commonality

Commonality means that the class members "possess the same interest and suffer the same injury." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982). That is, the plaintiff class must present a "common contention ... of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of one of the claims in one stroke." *Wal-Mart Stores v. Dukes*, 131 S.Ct. 2541, 2551 (2011).

The common question may be either an issue of law or of fact. *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 212, 679 P.2d 1159 (1984) (*Shutts II*), *aff'd in part, rev'd in part and remanded*, 472 U.S. 797 (1985). It is not necessary that class members share every factual and legal predicate. *Thompson v. Jiffy Lube Internat'l*, 250 F.R.D. 607 (D. Kan.2008). Even a single common issue of law or fact may be sufficient for certification. *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999). Thus, a common question of liability can support class certification, even if the court must conduct a subsequent individualized inquiry to determine the amount of damages. *Payson*, 2008 WL 4642639 at *4.

XTO argues against commonality on multiple grounds. Relying on recent decisions such as *Wal-Mart v. Dukes* and *Naylor Farms v. Anadarko OGC* Co., No. 08-668-R (W.D. Okla. 2011), the defendant argues that the prospective class presents no issue which can be resolved by a single answer, given the existence of multiple forms of underlying lease agreements. (Dkt. 183, at 8, 10, 12-13, 19-20). It stresses that a review of the leases involved suggests that there are some 20 different categories of leases, with some leases providing for royalties based upon "proceeds from the sale of gas as such at the mouth of the well," others involving "proceeds from the sale of gas as

such," or "the current market price at the wells," or the "prevailing market value at the well."(*Id*. at 17). Given this "great diversity of royalty clauses," XTO argues (*id*.), the case presents no common claim for certification in light of Kansas decisions that "lease language does matter." (I. at 2, 19 (citing *Sternberger v. Marathon Oil*, 257 Kan. 315, 894 P.2d 788 (Kan. 1995); *Matzen v. Hugoton Prod'n.*, 321 P.2d 576 (Kan. 1958)). Under *Smith v. Amoco Prod'n Co.*, 31 P.3d 255, 271 (Kan. 2001), XTO also argues (*id*. at 11, 15) that the plaintiff must show that XTO did not act as a prudent operator in marketing the gas, and that this is a question of fact. Further, in addition to the language of individual leases, XTO suggests that the court will be required to consider evidence beyond individual lease language, including local custom and usage at the time the leases were entered. (*Id*. at 20-21).

The court finds that the arguments presented by XTO present no substantial basis for denying certification. The Supreme Court found that commonality did not exist in *Wal-Mart* because plaintiffs had supplied "no convincing proof of a company-wide discriminatory pay and promotion policy." 131 S.Ct. at 2556. Indeed, the plaintiffs' evidence rested on the lack of any uniform policy:

> The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices. It is also a very common and presumptively reasonable way of doing business—one that we have said "should itself raise no inference of discriminatory conduct," *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

*Id*. at 2554 (emphasis in original).

In the present case, by contrast, XTO has conceded the existence of a generalized, uniform policy of charging royalty owners deductions for rendering the gas marketable. And the evidence suggests that this uniform policy was not adopted in a discriminating fashion, based on a careful

examination of the language in each lease, but was imposed on as a blanket policy against all royalty interest owners.

XTO suggests that *Wal-Mart v. Dukes* worked some sea change in class action jurisprudence. This is not so. The decision simply reflects the application of the long-standing rule that class members suffer a common injury, 131 S.Ct. at 2551, citing *Falcon*, 457 U.S. at 157, to facts which clearly established that defendant had *not* adopted any uniform policy, but in fact had done precisely the opposite: granting thousands of individual managers discretion to make employment decisions. That is not the case here.

Similarly, Judge Russell's decision in *Naylor Farms v. Anadarko OGC Co*., No. CIV-08-668-R, Orders (W.D. Okla. May 9, 2011, July 14, 2011, Sept. 14, 2011), finding that certain lease language did not impose a marketability duty under Oklahoma law, is not controlling here. His conclusion reflected a decision for the defendant on the merits, presented by means of summary judgment. In the same case, Judge Russell had previously upheld certification of the action, given that "all royalty owners are treated in the same manner with regard to the calculation of royalty payments." *Naylor*, Order of Aug. 26, 2009.

Further, Judge Russell was applying Oklahoma law. Although Kansas and Oklahoma law are similar in imposing an implied covenant to market, there are grounds for concluding that the states may apply different standards for defeating the implication. Quoting *Rogers v. Heston Oil Co.*, 735 P.2d 542, 546 (Okla. 1984), Judge Russell concluded that the implied covenant arises only if it is "not inconsistent with other terms of the lease." 2011 WL 7053782 at *2. In contrast, under Kansas law, the duty of marketability is imposed unless the other lease provisions unambiguously prevent such a result. That is, the duty arises absent "clear and express language [negating the duty]

8

in the royalty instrument itself." *Farrar v. Mobil* Oil, 43 Kan.App.2d at 885, 234 P.3d 19, 28 (citing *Gilmore v. Superior Oil*, 192 Kan. 388, 388 P.2d 602, Syl. ¶ 2 (Kan. 1964)).[1]

XTO attempts to distinguish *Farrar* on the grounds that the Kansas Supreme Court granted certification under K.S.A. 60-223 rather than Fed.R.Civ.Pr. 23 (Dkt. 183 at 29-30). But the state provision "mirrors the Federal Rule," *Anderson Office Supply v. Advanced Med. Assoc's*,__ P.3d_ , 2012 WL 892186, *17 (Kan.App. March 16, 2012), and has been consistently interpreted with reference to the federal rule. *See Farrar v. Mobil Oil*, 43 Kan.App.2d 871, 875 234 P.3d 19 (2010), *rev. denied*, Nov. 5, 2010 (Rule 23 "parallels" K.S.A. 60-223); *Dragon v. Vanguard Industr.*, 282 Kan. 349, 354, 144 P.3d 1279 (2006) (discussing K.S.A. 60-223 as "like its federal counterpart" Rule 23).

Here, commonality exists because defendant concedes the existence of "XTO's common method of calculating royalties," (Dkt. 183 at 35), and the defendant has failed to point to any lease provision unambiguously negating, in "clear and express language," the existence of any implied duty of marketability. This court has consistently determined that variations in lease language are insufficient in themselves to prevent certification, where the lessee has treated its royalty owners according to a standard formula. *See, e.g., Hershey*, 2011 WL 1234883 at *7; *Freebird*, 2011 WL

---

[1] In supplemental briefing, XTO also relies on two recent Oklahoma decisions by Judge Miles-LaGrange, *Tucker v. BP America Production Company*, ___ F.R.D.___, 2011 WL 6018406 (W.D. Okla. Dec. 2, 2011), and *Morrison v. Anadarko Petroleum*, No. 10-135-M (W.D. Okla. March 8, 2012). The court finds neither decision persuasive. After a very brief discussion of *Wal-Mart*, *Morrison* concludes in a single paragraph of analysis that commonality is lacking. Slip op. at 6. In *Tucker*, the court concluded the "plaintiff has failed to present evidence that defendant treats all royalty owners the same," 2011 WL 6018406 at *7. In the present case, in contrast, evidence of uniform treatment is present. Both cases, moreover, turn on considerations of Oklahoma law not relevant here.

13638, at *2. In contrast, XTO has pointed to no case involving a standard royalty methodology where class certification was denied.

The core of the defendant's argument, that variations in lease language is fatal to class certification, has been consistently rejected in recent decisions. *See Hershey*, 2011 WL 1234883 at *7; *Schell v. OXY UNITED STATES*, No. 07-1258, 2009 WL 2355792 (D. Kan. July 29, 2009); *Beer v. XTO Energy, Inc*, No. 07-798-L, 2009 WL 764500, at *5, 7 (W. D. Okla. Mar. 20, 2009). The variations in lease language cited by XTO are not controlling given that "absent an express provision to the contrary, Kansas courts seem to presume that implied covenants apply to *all* oil and gas leases." *Freebird*, 2010 WL 13638 at *7 (emphasis added).

Courts have implied the duty of marketability in cases involving "market value" leases, *Sternberger*, 257 Kan. at 321, 894 P.2d at 794 (1995); *Lightcap v. Mobil Oil Corp*., 221 Kan. 448, 562 P.2d 1 (1977); "proceeds" leases, and leases which combine features of both types. *Hockett v. Trees Oil*, 292 Kan. 213, 251 P.3d 65, 71 (2011) (royalty clause gave fractional interest in either "proceeds if sold at the well," or "market value at the well"). *See also Roderick v. XTO Energy*, 679 F.Supp.2d 1287 (D. Kan. 2010) finding that "at the well" royalty clauses "impose a general obligation on the part of the lessee to render the gas marketable"). Under Kansas law, the duty of marketability cannot be avoided by inference or suggestion, only by "clear and express" language disclaiming that duty. The defendant has pointed to no leases containing language meeting this strong standard, and the court finds that the plaintiff class has presented a common claim as to violation of the marketable condition rule.

The plaintiff class should be able to present its common claims without reference to individualized royalty owner testimony. Parole evidence will not be relevant in defining the

existence of a duty of marketability. *Farrar*, 43 Kan.App.2d at 888, 234 P.3d at 30 (use parole evidence or industry practice "has simply never been the law or practice in Kansas" in deciding question of implied covenants). The common claims arise from a duty imposed generally on oil and gas leases under Kansas law. Similarly, XTO's reliance on Kansas cases such as *Smith v. Amoco*, 31 P.3d 255, 31 P.3d 255 (2001) and *Robbins v. Chevron UNITED STATES*, 246 Kan. 125, 785 P.2d 1010 (199), discussing lessee liability under the reasonably prudent operator doctrine, are inapplicable, because the plaintiff's claims are not asserted under that doctrine and do not dispute XTO's use of third party marketing agreements. It challenges, instead, XTO's practice of imposing deductions to royalty owners as violating the implied duty of marketability. Such a challenge presents a common claim for purposes of class certification. *See Freebird*, 2010 WL 13638 at *7.

In addition to the general issue of the implied duty of marketability, the plaintiff has presented other common claims, including (a) the issues of the timing and location that gas products become commercially marketable, (b) the legality of taking condensate and helium without compensation, (c) the use of a uniform but non-transparent accounting and payment system, relevant to fraudulent concealment or open account doctrine as tolling XTO's statute of limitations defense, and (d) the propriety of deductions for conservation fees. As noted earlier, only one common issue of law or fact is sufficient for certification, and the court finds that the plaintiff has satisfied this element.

## 4. Typicality.

"Typicality "means that the claims or defenses of the representative parties are typical of those of non-representative members. *Thompson*, 250 F.R.D. at 610. This element focuses on the nature of the claims of the representative, not the individual characteristics of the plaintiff. Urethane II, 251 F.R.D. at 640. The representative must a show a nexus with the claims or defenses of non-representatives, but the claims need not be identical. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198-99 (10th Cir. 2010); *Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir.1988) ("differing fact situations of class members do not defeat typicality [if] the claims of the class representative and class members are based on the same legal or remedial theory"). "The burden of showing typicality is not an onerous one." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982), *cert. denied*, 460 U.S. 1083 (1983). As a practical matter, resolution of the element of typicality may frequently merge with the issue of commonality, as both elements seek to determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately represented in their absence." General Tel. v. Falcon, 457 U.S. at 157-58 n. 13.

A claim asserting improper, class-wide deductions does not lack typicality merely because the actual damages to individual members may vary:

> Again, the court finds that the over-riding question is simply whether the deductions were improper. Only if that question is answered affirmatively will individualized inquiries become reality, and such a determination would only assess the damages. In essence, defendants raise issue with the extent of a possible injury, while the court is more concerned about whether there was a violation or not. As such, plaintiffs have met the typicality requirement.

Payson, 2008 WL 4642639 at *4

The court finds that Roderick's claims for breach of lease, unjust enrichment, and accounting are typical of the claims that other class members would bring. Both Roderick and non-representative members share claims relating to the claim of improper deductions in violation of the duty of marketability, deductions which are made by the defendant's common and uniform accounting system.

## 5. Adequacy

Under Rule 23(a)(4), the court should consider both the class representative and counsel with respect to the existence of any potential conflict of interest, and whether they are likely to vigorously advance the interests of the class. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002). The burden is on the plaintiff to show that its interests are aligned with those of other Kansas royalty owners, and that it will vigorously prosecute the action through qualified class counsel. *Id.*

The prospective class representative is the plaintiff Wallace B. Roderick Revocable Living Trust, Trustee Wallace B. Roderick, which owns royalty interests in eight wells in Kearney County, Kansas, for which it receives royalty payments from XTO. Prospective class counsel has participated successfully in many oil and gas class actions.

XTO does not challenge the adequacy of prospective class counsel. However, it does challenge Roderick as a class representative, first, because the leases for the eight Roderick wells reflect only three of the twenty basic lease forms in issue, and second, because the Trustee Wallace B. Roderick has essentially no effective control over the litigation. (Dkt. 183, at 35-36). XTO advances the latter argument on the basis of responses made by Wallace Roderick in his deposition.

The court has reviewed Wallace Roderick's deposition, and finds that none of the responses cited by XTO generates any substantial basis for finding that his "participation is so minimal that the plaintiff has virtually abdicated to his or her attorney the conduct of the case." *Shiring v. Tier Tech.*, 244 F.R.D. 307, 316 (E.D. Va. 2007). Wallace testified that "I've read some things, of course, pertaining to this case and some with the Oxy, but I don't understand all of this legal terminology and all. That's the reason I have an attorney." And he also did not recall immediately some specific tactical decisions, such as severing the Oklahoma well claims, indicating simply that this was done on the advice of counsel.

But a party does not abdicate control of litigation merely by relying on the advice of counsel, nor need he recall the exact details of each pleading or the tactics chosen by counsel. Any lay person, and for that matter, lawyers unfamiliar with this area of practice, may become confused by complex legal pleadings or terminology. As Roderick testified, "That's the reason I have an attorney." Read in context, the Roderick deposition shows the utterly unremarkable: a client who defers to experienced counsel in matters of detail and tactics, but who remains in charge of all material strategic decisions.

Rule 23 does not require the class representative to exercise the level of knowledge and legal acumen equivalent to an attorney. It requires only that he be "able to prosecute the action vigorously *through qualified counsel*." *Eatinger*, 2010 WL 3023957 at *4 (emphasis added). In contrast to the uninformed — and, the court found, less than completely honest — class representative in *Shiring*, the court finds that Wallace Roderick here is both credible in his testimony and affidavit (Dkt. 177), has exhibited knowledge as to the claims in the case, understands the role of class representative and

14

the nature of the action, communicates and consults with qualified class counsel, has reviewed or had the opportunity to review all important pleadings in the action,

In addition, certification will be refused on grounds of inadequate representation only where there is a fundamental conflict in interests between the representative and non-representatives. *Eatinger v. BP Am. Prod'n*, 271 F.R.D. 253, 260 (D. Kan. 2010). The court finds that the adequacy of representation is not defeated simply because the Roderick leases do not include all the permutations of lease language gleaned by XTO in its sampling of Kansas leases. As noted earlier, the defendant has failed to point to any leases which meet the standard of "clearly and expressly" standard for excluding application of the duty of marketability. Representation is inadequate only where the representative has a conflict which goes to the heart of the claims made by the class. *Sosna v. Iowa*, 419 U.S. 393, 403. Speculative or minor conflicts are insufficient to defeat certification on grounds of adequacy of representation. *See In re Motor Fuel Temperature Sales Practices Litig'n*, 271 F.R.D. 221, 233 n. 21 (2010).

## 6. Predominance

As noted earlier, the plaintiff seeks certification under Rule 23(b)(3), which requires a showing that common claims will both predominate over individual claims, and that class action is a superior format for resolution of the dispute. The defendant contends that the court should reject certification, on the grounds common claims do not predominate, and the court will be required to conduct a lease-by-lease examination of individual claims.

In resolving issues of predominance and superiority, the court examines:

(A)  the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)  the likely difficulties in managing a class action.

The element of predominance requires a showing that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prod. v. Windsor*, 521 U.S. 591, 623 (1997).

This court has rejected a similar contention that individual issues as to lease language would predominate in *Freebird*, 2011 WL 13638 at *8, "[b]ecause Kansas Supreme Court jurisprudence in this area indicates that the implied covenant to market applies to all gas leases irrespective of the unique circumstances that give rise to the lease."

This is true in the present action, as well. Common issues as to royalty charges predominate over individual matters. The core of the plaintiff's claims center on the duty of marketability and XTO's practice of issuing uniform deduction, fees, and charges. Evidence as to the circumstances underlying individual leases or historical industry practice is generally irrelevant. *See Farrar*, 43 Kan.App.2d at 888, 234 P.3d at 30 ("examin[ing] parole evidence, surrounding circumstances, or extant industry practice [for proof of implied duties] has simply has never been the law or practice in Kansas"). Accordingly, the focus of the present action is upon the actions of XTO, and substantial evidence as to individual issues is unlikely.


## 7. Superiority

Finally, certification under Rule 23(b)(3) requires a showing by the plaintiff that a class action is the preferable form for resolving the claims involved. *Payson*, 2008 WL 4642639 at *5. In this context, the court may appropriately consider the costs and expenses of resolving the plaintiff's royalty claims through hundreds or thousands of individual lawsuits. *See In re Univ. Serv. Fund Tel. Billing Practices Litig'n*, 219 F.R.D. 661, 679 (D. Kan. 2004); *Farrar v. Mobil Oil*., 43 Kan.App.3d at 875-76, 234 P.3d at 24.

The plaintiff contends that a class action is not only superior but necessary, as only such a procedure will permit the resolution of the claims for the prospective class, given that many members may possess claims too small to be economically advanced as separate litigation. XTO does not address the issue of superiority in its Response, and the court finds that the plaintiff has satisfied this element.

## 8. Substantive Rights

Finally, the court notes the defendant's argument that a class action will abridge its substantial rights by requiring a general trial on its liability notwithstanding language variations in individual leases. (Dkt. 183, 35-36). The defendants again rest their argument in substantial part on *Wal-Mart v. Dukes*, 131 S.Ct. at 2560-61 (noting that under 28 U.S.C. § 2072(b) courts may not interpret Rule 23 to abridge, enlarge or modify substantive rights). But the Supreme Court broke no new ground in this observation, and focused in its opinion only on the remarkable procedure proposed by the Ninth Circuit for considering the plaintiffs' claims for backpay, certified under Rule 23(b)(2).

> The Court of Appeals believed that it was possible to replace such [individual] proceedings with Trial by Formula. A sample set of the class members

> would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master. The percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings. We disapprove that novel project.

*Id.* at 2561 (citation omitted). The court held that such as system could not be adopted as incidental to Rule 23(b)(2), which authorizes class actions for injunctive or declaratory relief, since backpay is an inherently individualized determination. *Id*. at 2558 ("we think it clear that individualized monetary claims belong in Rule 23(b)(3)"). The claims were individualized because of the underlying aspects of Title VII liability:

> Title VII includes a detailed remedial scheme. If a plaintiff prevails in showing that an employer has discriminated against him in violation of the statute, the court "may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, [including] reinstatement or hiring of employees, with or without backpay ... or any other equitable relief as the court deems appropriate." § 2000e–5(g)(1). But if the employer can show that it took an adverse employment action against an employee for any *2561 reason other than discrimination, the court cannot order the "hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any backpay." § 2000e–5(g)(2)(A).

> We have established a procedure for trying pattern-or-practice cases that gives effect to these statutory requirements. When the plaintiff seeks individual relief such as reinstatement or backpay after establishing a pattern or practice of discrimination, "a district court must usually conduct additional proceedings ... to determine the scope of individual relief." *Teamsters* [*v. United States*], 431 U.S. [324,] 361, 97 S.Ct. 1843 [52 L.Ed.2d 396 (1977)]. At this phase, the burden of proof will shift to the company, but it will have the right to raise any individual affirmative defenses it may have, and to "demonstrate that the individual applicant was denied an employment opportunity for lawful reasons."

*Id.* at 2560-61.

In the present action, the plaintiff seeks certification under Rule 23(b)(3), not 23(b)(2). Further, the defendant has pointed to no substantive rights which would be actually abridged by

18

certification. The court has determined that common claims predominate in the action, and any remaining individualized issues may be tried on an individual basis after resolution of the common claims.

IT IS ACCORDINGLY ORDERED this 27th day of March, 2012, that the plaintiff's Motion for Certification (Dkt. 172) is granted; defendant's Motion to Supplement (Dkt. 189) is granted; and defendant's Motion for Hearing (Dkt. 193) is denied.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE