## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WALLACE B. RODERICK
IRREVOCABLE LIVING TRUST, Amanda
Roderick, Successor Trustee, on behalf of
itself and all others similarly situated,

      *Plaintiff,*

vs.

                        Case No. 08-1330-EFM-GEB

XTO ENERGY, INC.,

      *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Wallace B. Roderick Revocable Living Trust ("the Trust") owned natural gas
wells that were operated by Defendant XTO Energy, Inc. ("XTO").  The Trust claims that it was
underpaid in royalty fees by XTO.  In what has been a long and complicated case, the parties
finally seek to resolve the issue of who exactly is suing XTO.  Is the Trust suing XTO in its
individual capacity?  Or is it suing XTO on behalf of a class of over 1,700 other royalty owners?
In 2012, this Court certified a class of Kansas royalty owners represented by the Trust.  XTO
appealed that decision, and the Tenth Circuit vacated the order and remanded for further
proceedings.  Now before the Court is the Trust's second motion for class certification (Doc.
351), which XTO opposes.  Contemporaneously, the Trust seeks summary judgment that every
lease in the putative class contained certain implied duties—an issue critical to the Court's class-

certification analysis.  Because analysis of the leases is an essential factor in determining whether class certification is proper, the Court will also consider evidence and arguments contained in the Trust's accompanying motion for partial summary judgment (Doc. 353).  For the reasons stated below, the Court denies the Trust's motion.

## I.        Factual and Procedural Background

XTO is an oil and gas company that produces natural gas and its constituent products from wells.  The Trust owns eight Kansas well which it leases to XTO and for which it receives royalty payments.   The Trust claims that XTO has systematically underpaid royalties by deducting costs associated with placing gas and its constituent products in marketable condition.

A brief explanation of Kansas oil and gas law is required in order to understand the Trust's claim.  Under Kansas law, oil and gas leases impose on the operator—XTO in this case—an implied duty to market the minerals produced.[1]  Corollary to this implied duty to market is the marketable condition rule,[2] which "requires operators to make gas marketable at their own expense."[3]  These duties can be contractually disclaimed.[4]  If the duties were not

---

[1] *See Fawcett v. Oil Producers, Inc. of Kan.*, 302 Kan. 350, 351, 352 P.3d 1032, 1034 (2015); *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 331, 894 P.2d 788, 800 (1995).

[2] The Tenth Circuit actually refers to "the implied duty of marketability."  But both Kansas courts and the Trust call this same duty the "marketable condition rule." *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1216 (10th Cir. 2013) ("Pursuant to [the implied duty of marketability], lessees are obligated to bear the full cost of production expenses, such as gathering, compression, dehydration, treatment, and processing, which are undertaken to transform gas into a marketable product.") (internal quotation marks omitted); *but see Fawcett*, 302 Kan. at 352, 352 P.3d at 1034-35 ("[T]he [marketable condition rule] requires operators to make gas marketable at their own expense.").  Since Kansas law controls, and to avoid confusion, the Court will exclusively use the term "marketable condition rule" when referring to an operator's duty to make gas marketable at its sole expense.

[3] *Fawcett*, 302 Kan. at 352, 352 P.3d at 1034-35; *see also Sternberger*, 257 Kan. at 330, 894 P.2d at 799-800 ("The lessee has the duty to produce a marketable product, and the lessee alone bears the expense in making the product marketable.").

[4] *Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

disclaimed in this case, XTO would have been required to make the raw gas marketable and to bear the accompanying costs.  Steps taken to make raw gas marketable often include gathering, compression, dehydration, treatment, and processing ("GCDTP") services.[5]  But in other circumstances, gas may be marketable at the well.[6]

According to the Trust, all of the gas produced from its wells was subject to the following process.  All of the raw gas came from low pressure wells and was saturated with water vapor when it emerged from the ground.  From each individual well, raw gas was collected into a gathering line and comingled with raw gas from other wells and leases affiliated with XTO. Once in the gathering system, the gas was dehydrated and compressed.  The gas would then travel through the gathering line to a processing plant, where natural gas liquids were extracted and the raw gas was transformed into residue gas of a pipeline quality.  From there, the gas entered a "booster compressor" so that it could enter a major interstate transmission system.

XTO did not perform any of the above post-removal procedures.  Instead, it sold the raw gas to third parties at the gathering system inlet, before any GCDTP services were performed. The price that these third parties paid for gas at the wellhead was based either on the purchaser's resale price or on an index price that reflected the sale of gas after it had been further processed. The third parties paid the index or resale price, less costs for gathering the gas.  Royalty payments made to the Trust were based on XTO's contracts with these third parties.

The Trust argues that the gas was not in marketable condition when XTO sold the gas to the third parties.  Instead, the Trust contends that XTO used these third party contracts to skirt the marketable condition rule.  The Trust claims that the third parties paid XTO less for the gas

---

[5] *Roderick*, 725 F.3d at 1216.

[6] *E.g.*, *Sternberger*, 257 Kan. at 330, 894 P.2d at 800.

because it required GCDTP services to be marketed. As a result, the Trust received smaller royalty payments for gas that was not in marketable condition. So the Trust argues that by selling raw gas at a price reduced by anticipated GCDTP costs, XTO was sharing with royalty owners those costs required to render the gas into marketable condition.

The Trust claims that it was not the only royalty owner that XTO underpaid. According to the Trust, over 1,700 royalty owners' gas was subject to the same extraction process and royalty payment system. The Trust moves to certify the following class:

> All royalty owners of XTO Energy, Inc. (and its affiliated predecessors and successors) in Kansas wells operated by XTO that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1999 to the date Class Notice is sent.

> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States) including United States leases; (2) Defendant, its affiliates, predecessors, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; and (4) the claims of royalty owners as to Kansas wells gathered by Timberland and processed at the Tyrone Plant.

This Court granted the Trust's first motion for class certification (Doc. 201). On appeal, the Tenth Circuit vacated that order and remanded for further proceedings. The Tenth Circuit directed this Court to rigorously analyze whether the Trust has affirmatively demonstrated that class certification is proper.[7] Specifically, with regards to commonality and predominance, the Court is directed to consider the various leases involved and the point at which gas was marketable.[8] Relevant law has developed since the Trust first sought class certification. In

---

[7] *Roderick*, 725 F.3d at 1217.

[8] *Id.* at 1217-19

*Fawcett v. Oil Producers, Inc. of Kansas*, the Kansas Supreme Court clarified the effect of the marketable condition rule and considered facts very similar to the instant case.[9]

Guided by the Tenth Circuit's direction and the recent developments in Kansas oil and gas law, the Court turns to the Trust's motion for class certification.

## II.   Legal Standard

Class action certification is governed by Rule 23 of the Federal Rules of Civil Procedure. The Court has broad discretion in deciding whether to certify a class.[10]   Under Rule 23(a), the Trust must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).   After meeting these requirements, the Trust must demonstrate that the proposed class action fits within one of the categories in Rule 23(b).

Here, the Trust seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."   The requirements of Rule 23(b)(3) ensure that a class is sufficiently cohesive to warrant adjudication by representation.[11]   The predominance question asks whether common issues are more prevalent or important than non-common, individual

---

[9] 302 Kan. 305, 352 P.3d 1032 (2015).

[10] *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1085 (10th Cir. 2014).

[11] *Amchem Prods. v. Windsor*, 521 U.S. 591, 622-223 (1997).

issues.[12]   "[P]redominance may be destroyed if individualized issues will overwhelm those questions common to the class."[13]

### III.    Analysis

The Tenth Circuit specifically directed this Court to determine whether the Trust satisfied the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3).[14]

Under Rule 23(a)(2), the Trust must demonstrate that there are questions of fact or law common to the putative class.  To satisfy this requirement, the Trust must show that the class members "have suffered the same injury."[15]  But "the mere raising of a common question" does not satisfy the commonality requirement.[16]   Instead, the claims must turn on a common contention "of such a nature that it is capable of classwide resolution."[17]

The Tenth Circuit directed this Court to consider two factors in analyzing commonality: (1) whether implied duties were common to every lease in the putative class; and (2) whether and to what extent marketability affects commonality.[18]  XTO challenges commonality on each of those grounds.

---

[12] *CGC Holding*, 773 F.3d at 1087.

[13] *Roderick*, 725 F.3d at 1220.

[14] *Id.* at 1217-1220.

[15] *Gen. Tel. Co of Sw. v. Falcon*, 457 U.S. 147, 157 (1982).

[16] *Roderick*, 725 F.3d at 1218.

[17] *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (understanding classwide resoluation to mean that "determination of [the common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

[18] *Roderick*, 725 F.3d at 1219.

**A. Leases**

The Trust must demonstrate that the marketable condition rule was implied in every lease in the putative class.[19]   Additionally, the Trust contends that the implied duty of good faith and fair dealing was also common to the class.

*1.   Marketable Condition Rule*

The Tenth Circuit directed this Court to consider whether the Trust could affirmatively demonstrate that the marketable condition rule was implied in leases throughout the putative class.[20]   Under Kansas law, oil and gas leases impose on operators a duty to market the minerals produced.[21]   Corollary to this implied duty to market is the marketable condition rule.[22]   The marketable condition rule "requires operators to make gas marketable at their own expense."[23] This implied duty can be contractually disclaimed with express language showing contrary intent.[24]   So at first glance, the issue seems simple: either the marketable condition rule was implied throughout the class, or it was disclaimed by some of the leases.   But the parties disagree as to what conduct is actually required by the marketable condition rule.[25]   Since the parties have different understandings of the marketable condition rule, and since it can only be disclaimed by

---

[19] *Id.* at 1218-19.

[20] *Roderick*, 725 F.3d at 1218.

[21] *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 131, 785 P.2d 1010, 1014 (1990).

[22] *Fawcett*, 302 Kan. at 352, 352 P.3d at 1034-35.

[23] *Id.* (citing *Sternberger*, 257 Kan. at 330, 894 P.2d at 799).

[24] *See Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 886, 234 P.3d 19, 29 (2010); *Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

[25] XTO's briefing does not address the marketable condition rule; rather, it addresses "Plaintiff's marketable condition rule."   But the marketable condition rule and the conduct it requires are defined in Kansas law. Neither party can redefine it here.

express language showing contrary intent, the Court must identify the limits and effect of the rule before determining whether it was common to the class. *Fawcett* is instructive in this regard.

A key development in *Fawcett* is that the implied duty to market and the marketable condition rule "do not impose on the operator as a matter of law the responsibility to perform the post-production, post-sale [GCDTP services]."[26]  Instead, the allocation of expenses under the marketable condition rule turns on the express and implied obligations arising from the individual leases.[27]  Ultimately, the operator's duty to make gas marketable is satisfied when the operator delivers the gas in a good faith transaction.[28]  In other words, *Fawcett* stands for the seemingly obvious proposition that gas is in marketable condition once it can be marketed.[29]  So once gas is being marketed in a good faith transaction, it is in marketable condition.

Here the putative class comprises 575 leases.  The parties' characterizations of the royalty clauses differ; the Trust claims there are 17 different forms of royalty clauses while XTO maintains there are no fewer than 29 different forms of royalty clauses.  But the parties' categorization of the leases is immaterial to determining whether any of the individual leases expressly disclaimed the marketable condition rule.  Even if each of the 575 leases was unique, the duty to market and marketable condition rule would be implied in them all absent an express

---

[26] *Fawcett*, 302 Kan. at 352, 352 P.3d at 1035.

[27] *Id.* at 359, 352 P.3d at 1038.

[28] *Id.* at 365, 352 P.3d at 1042.

[29] Both parties briefed extensively (and almost exclusively) about whether the marketable condition rule would have required XTO solely to bear the costs for any or all GCDTP services in this case.  *Fawcett* mandates such a determination cannot be made as a matter of law, and the Court will not do so here.  The marketable condition rule would require XTO to bear all costs required to render the gas in the condition required for the completion of a good-faith sale.  Whether XTO complied with that duty is a question for another time.

provision to the contrary.[30]  While *Fawcett* dictates that specific royalty obligations may vary from lease to lease, it still reaffirms that a duty exists, unless it is disclaimed.[31]

All told, the leases fall into one of three types of royalty clauses recognized in Kansas courts: (1) the proceeds lease; (2) the market value lease; and (3) the *Waechter* lease.[32]  Kansas courts have implied the marketable condition rule into all three types of royalty clauses.[33]  In fact, "absent an express lease provision to the contrary, Kansas courts seem to presume that implied covenants apply to all oil and gas leases."[34]  Thus, although the Trust bears the burden of demonstrating that the marketable condition rule was common to the class, the bar is low to make such a showing.[35]  The Trust can meet its burden by simply demonstrating that none of the leases expressly disclaim the implied covenants.

The Court reviewed the 29 royalty clause variations identified by XTO.  None of the royalty clause variations expressly authorized operators to deduct from royalty payments the costs for making the gas marketable.  And none of the royalty clauses expressly make the royalty

---

[30] *See Freebird, Inc. v. Merit Energy, Co.*, 2011 WL 13638, at *7 (D. Kan. Jan. 4, 2011) ("[A]bsent an express lease provision to the contrary, Kansas courts seem to presume that implied covenants apply to all oil and gas leases.").

[31] *Fawcett*, 302 Kan. at 361, 352 P.3d at 1040.

[32] Under a proceeds lease, the operator is required to pay the royalty owner a share of the actual monies received from the sale of the gas. *Smith v. Amoco Prod. Co.*, 272 Kan. 58, 76, 31 P.3d 255, 268-69 (2001).  Under a market value lease, royalty payment amounts are based on the price that would be paid by a willing buyer to a willing seller in a free market. *Id.* And a *Waechter* lease is a hybrid of a proceeds and a market value lease.  Under a *Waechter* lease, royalties are calculated based on either proceeds or market value, depending on the location where gas is sold. *Waechter v. Amoco Prod. Co.*, 217 Kan. 489, 509-12, 537 P.2d 228, 247-49 (1975).

[33] *See Fawcett*, 302 Kan. 350, 352 P.3d 1032 (finding that marketable condition rule was implied in *Waechter* leases); *Sternberger*, 257 Kan. 315, 894 P.2d 788 (finding that marketable condition rule was implied in market value leases); *Freebird*, 2011 WL 13638, at *4 (citing *Robbins*, 246 Kan. at 131, 785 P.2d at 1014 (noting that the marketable condition rule is implied in proceeds leases).

[34] *Freebird* 2011 WL 13638, at *7.

[35] *Roderick*, 725 F.3d at 1218 ("[W]e think it was the Trust's burden to affirmatively demonstrate commonality on the implied duty of marketability.").

owner, and not the operator, responsible for marketing the gas or bearing such costs. In short, none of the royalty clauses contain any language that clearly express intent contrary to the implied duty to market and the marketable condition rule. XTO claims that the facts in this case are "virtually indistinguishable" from *Fawcett*. Yet XTO also argues that the leases are not common throughout the putative class, even though the duty to market and marketable condition rule were both implied throughout the class *Fawcett*.[36] Here, as in *Fawcett*, the duty to market and marketable condition rule are implied throughout the class.

The Court finds that the marketable condition rule is common to the class because no lease clearly or expressly disclaims such a duty. Despite its extensive arguments about whether it breached the marketable condition rule, XTO has not contradicted the Trust's claim that the implied duty is common throughout the class.

### 2. *Implied Duty of Good Faith and Fair Dealing*

The Trust also asserts that a covenant of good faith and fair dealing was implied in every lease throughout the putative class. Under Kansas law, a duty of good faith and fair dealing is implied in all contracts other than those for at-will employment.[37] Oil and gas leases are also subject to this implied covenant.[38]

In its response, XTO notes that it "does not quarrel with the unremarkable proposition that Kansas implies a duty of good faith and fair dealing in contracts." And yet XTO goes on to argue extensively not about whether the duty is implied, but rather about whether XTO's conduct

---

[36] *Fawcett*, 302 Kan. at 351-52, 352 P.3d at 1034-35.

[37] *Pollock v. Crestview Country Club Ass'n*, 41 Kan. App. 2d 904, 312, 205 P.3d 1283, 1289 (2009).

[38] *See Kan. Baptist Convention v. Mesa Operating Ltd. P'ship*, 253 Kan. 717, 724-26, 864 P.3d 204, 210-11 (1993) (applying implied obligation of good faith in oil and gas lease).

constituted breach of that duty.  To assuage concerns about the consequences of the Court finding such a duty is implied, the Court will first identify the scope of the implied duty of good faith and fair dealing.[39]  Kansas courts have described the duty of good faith and fair dealing in this way:

> Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties . . . [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Ordinarily, if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary and unreasonable conduct on the part of the promisee.  However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.[40]

This is the duty that the Trust argues is implied throughout the class.  And XTO never disputes that specific claim.  XTO only argues that it never breached the implied duty.  At present, the Trust only argues that the implied duty of good faith and fair dealing is implied throughout the putative class.  Therefore, arguments about whether that duty was actually breached are premature at this stage.

For the reasons stated above, the Court finds that both the marketable condition rule and the duty of good faith and fair dealing were implied throughout the putative class.

---

[39] XTO also argues that consideration of this issue is improper because, at the time this issue was briefed, the Trust had not been granted leave to amend its complaint to include a claim for breach of the implied duty of good faith and fair dealing.  However, leave to amend was granted (Doc. 417), and the Trust subsequently amended its complaint to add a claim for breach of the implied duty of good faith and fair dealing.

[40] *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792, 81 (1987) (citations omitted).

**B.  Marketability**

The Tenth Circuit also directed this Court to consider whether and to what extent marketability affects commonality.[41]  Whether XTO violated the marketable condition rule depends on when the gas in question reached marketable condition.  Commonality would not exist if gas from various wells in the putative class reached marketable condition at different stages.  "[I]f gas is in marketable condition at the mouth of 'Well A' but not 'Well B,' XTO's deductions likely would be proper for Well A's royalty owners, but a breach of the [marketable condition rule] for Well B's royalty owners."[42]  *Fawcett* provides greater guidance in the area of marketability.  The Kansas Supreme Court rejected the proposition that marketability can be determined as a matter of law, and went on to hold that an operator's duty to make gas marketable is satisfied "when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[43]  This "good faith" qualification impacts the Court's commonality determination.

While there may be some overlap, it is important to note that determination of the good faith element of marketability and the Trust's claim for breach of the implied duty of good faith and fair dealing are not conterminous.  The latter addresses the relationship between the Trust and XTO and prohibits either party to the oil and gas leases from "purposely do[ing] anything to prevent the other party from carrying out his part of the agreement, or do[ing] anything which will have the effect of destroying, or injuring the right of the other party to receive the fruits of

---

[41] *Roderick*, 725 F.3d at 1219.

[42] *Id.*

[43] *Fawcett*, 302 Kan. at 365, 352 P.3d at 1042.

the contract."[44]   Conversely, the good faith element of marketability is a narrower question involving analysis of the transaction between XTO and the purchaser of the gas.[45]   *Fawcett* dictates that gas is in marketable condition when it is delivered in a good faith transaction in a condition acceptable to the purchaser.[46]   When determining whether gas is in marketable condition, the Court must look at the transaction between the operator and the purchaser and ask whether those two parties were acting in good faith and whether the purchaser found the gas to be in an acceptable condition.[47]

The Trust contends that the question of when the gas was subject to a good faith transaction, and thus reached marketable condition, is a common question that will have the same answer for each well in the class.   The Trust argues that since all of the raw gas was gathered, comingled, processed, and transported in the same manner, the point of marketability—wherever that point may be—is uniform throughout the class.[48]   The Trust's theory relies on expert opinions that establish a given quality or condition at which the gas in this case became marketable.   Relying on this theory, the Trust argues that XTO's transactions at the gathering line were not true sales and were not made in good faith.   But the Trust's argument conflicts with Kansas law as articulated in *Fawcett*.   *Fawcett* made clear that the question of

---

[44] *Bonanza*, 242 Kan. at 222, 747 P.2d at 801.

[45] *Id.* at 365, 352 P.3d at 1042.

[46] *Id.*

[47] To be sure, a sham sale to midstream purchasers is one way in which the implied covenant of good faith and fair dealing could be breached. *See Fawcett*, 302 Kan. at 366, 352 P.3d at 1042   But the implied covenant covers more conduct than just XTO's contracts with third parties.

[48] The Trust's allegations as to these processes are primarily taken from the declaration of Daniel Reineke (Doc. 287).   This report accompanied the Trust's earlier motion for partial summary judgment on the marketable condition rule—which the Court has found moot (Doc. 422)—but was incorporated by reference into the Trust's motion for class certification.

marketability is a factual one.  There is no "precise quality or condition at which gas becomes marketable."[49]   Rather, the marketability of gas is "an open question" that depends on the parties' willingness to buy and sell it.[50]  The gas in this case reached marketable condition when XTO was able to deliver gas in a condition acceptable to the purchaser in a good faith transaction.[51]   XTO sold gas at the wellhead to six different purchasers through fourteen separate arm's length contracts.  All of those fourteen sales contracts could have been made in good faith, all of them could have been made in bad faith, or a combination could be true.  But such a determination must be made with each individual contract.[52]   The Court has not received evidence regarding the nature of these fourteen sales contracts.   In its motion for class certification, the Trust focuses exclusively on the GCDTP services that the gas required in order to reach its definition of marketable condition.  But the uniformity of these processes is irrelevant to the question of marketability.  What matters is whether the gas was subject to a good faith transaction.  So a commonality turns on uniformity of the sales contracts and not uniformity of the processing methods.  Because the Trust has failed to produce such arguments or evidence about the fourteen individual sales contracts, it has not demonstrated commonality with regards to marketability.[53]

---

[49] *Fawcett*, 302 Kan. at 363, 352 P.3d at 1041 (internal quotation marks omitted).

[50] *Id.*

[51] *Id.* at 365, 352 P.3d at 1042.

[52] *Id.* at 360, 352 P.3d at 1039 ("[I]f the question were whether those negotiated formulas produce an adequate price, the answer would seem to require a fact-based analysis to determine whether the operator entered into good faith sales and whether the terms of those sales were reasonable under the circumstances.").

[53] There could be anywhere between 1 and fourteen classes in this case, but the Court cannot make such a determination without analyzing the individual wellhead sales to third-party purchasers.

Following the Tenth Circuit's decision in this case, but prior to the *Fawcett* decision, this Court reached a similar conclusion with regards to marketability.  In *Arkalon Grazing Ass'n v. Chesapeake Operating Inc.*, the Court held that the plaintiff could not show that the condition of gas, with regard to marketability, was common throughout a class of 400 wells.[54]   Although *Fawcett* would later reject the theory that the marketability of gas turned on its precise condition, the rationale is the same.  In *Arkalon*, the Court found that the plaintiff could not demonstrate that the attribute which renders gas marketable was uniform throughout the class.  That attribute was gas quality in *Arkalon*; after *Fawcett*, that attribute is whether the gas could be marketed in a good faith transaction.[55]   In either case, a more individual analysis is required.  Although the Trust alleges that XTO extracted and processed the gas in the same manner, it has not demonstrated that XTO's fourteen wellhead transactions were of a uniform nature to uniform buyers.  The question of whether the transactions were in good faith could have fourteen different answers.  And so the question of marketability is not "of such a nature that it is capable of classwide resolution" and its determination will not "resolve an issue that is central to the validity of each one of the claims in one stroke." [56]   Instead, identifying the point at which the gas became marketable requires fourteen individualized inquiries that overwhelm a single common question.[57]

---

[54] 2014 WL 3089556, at *3 (D. Kan. July 7, 2014).

[55] If a sale occurred, the Court can assume gas was in an condition acceptable to the purchaser. *See Fawcett*, 302 Kan. at 365, 352 P.3d at 1042 ("[T]he duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction.").

[56] *Dukes*, 564 U.S. at 350.

[57] *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 F. App'x 938, 943 n.4 (10th Cir. 2013).

The Trust argues that since *Fawcett* dealt with the gas contracts between the operator and third parties *en masse*, this Court may do so as well.  But the court in *Fawcett* was only able to do so because the plaintiffs in *Fawcett* did not challenge the good faith of those transactions.[58] Here, the Trust does challenge the good faith of these sales; in fact, the Trust goes even further and argues that these transactions were not actually sales at all.  This challenge requires an analysis of each sales contract; such an analysis was stipulated away in *Fawcett*.

Because the Trust fails to demonstrate uniformity with regards to the fourteen separate transactions between XTO and third-party purchasers, the question of marketability is not common to the putative class.  And because the issue of marketability is not common to the putative class, the requirements of Rule 23(a)(2) are not met.  Class certification is improper. Because commonality is lacking, the Court need not consider whether the Trust has demonstrated predominance.

## IV.   Conclusion

The Court denies the Trust's motion to certify the class (Doc. 351).  Because class certification is improper, the Court also denies as moot two motions in which the Trust seeks partial summary judgment on behalf of the proposed class (Docs. 353 and 355).[59]  Finally, the Court denies XTO's motion to stay consideration of the Trust's motions (Doc. 364) because that issue is no longer material.

---

[58] *Fawcett*, 302 Kan. at 366, 352 P.3d at 1042 ("In this case, [the plaintiff] does not challenge [the defendant's] good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail.").

[59] *See Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1349 (2013) ("[A] plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified.").

**IT IS THEREFORE ORDERED** that the Trust's Second Motion to Certify the Class (Doc. 351) is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Trust's Motion for Partial Summary Judgment on Leases (Doc. 353) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Trust's Motion for Partial Summary Judgment Under *Hockett v. Trees Oil* (Doc. 355) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that XTO's Motion to Stay Consideration of Plaintiff's Motions for Partial Summary Judgment on Behalf of the Uncertified Class (Doc. 364) is hereby **DENIED.**

**IT IS SO ORDERED**.

Dated this 22nd day of June, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE