# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WALLACE B. RODERICK
IRREVOCABLE LIVING TRUST, Amanda
Roderick, Successor Trustee, on behalf of
itself and all others similarly situated,

     *Plaintiff,*

vs.

          Case No. 08-1330-EFM-GEB

XTO ENERGY, INC.,

     *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Wallace B. Roderick Irrevocable Living Trust ("the Trust") owns natural gas wells operated by Defendant XTO Energy, Inc. ("XTO"). The Trust's wells are subject to five leases with XTO. Pursuant to those leases, the Trust receives as royalty a percentage of the proceeds of gas sold by XTO. The Trust claims that XTO sold gas that was not in marketable condition, and in doing so, shared with the Trust those costs required to render gas into marketable condition in violation of the marketable condition rule, an implied duty under Kansas law. The Trust also seeks to recover unpaid and underpaid refunds for conservation fees that XTO improperly deducted from royalty payments prior to 2011. XTO now moves for summary judgment, arguing that its wellhead sales satisfied the marketable condition rule and the implied duty to market (Doc. 370). XTO also seeks judgment that it applied the proper interest rate in

refunding deducted conservation fees and that certain claims for conservation fees are barred by the statute of limitations (Doc. 372). Lastly, XTO requests that the Court review Magistrate Judge Birzer's Memorandum and Order dated February 24, 2016 (Doc. 421). For the reasons stated below the Court grants in part and denies in part XTO's motion for partial summary judgment on the Trust's marketable condition claim, grants XTO's motion for partial summary judgment on the Trust's conservation fees claims, and denies XTO's motion for review.

## I.    Factual and Procedural Background[1]

### A.  Marketable Condition Claim

XTO is an oil and gas company that produces natural gas and its constituent products from wells. The Trust owns wells that it leases to XTO and for which it receives royalty payments. The Trust's wells are subject to five leases with XTO, with the leases containing one of two royalty clauses. Royalty Provision 1 requires that XTO pay the Trust "one-eighth (1/8) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then, one-eighth (1/8) of the market value thereof at the well." Royalty Provision 2 requires XTO to pay the Trust "one-eighth (1/8) of the gross proceeds at the prevailing market rate."

XTO sells gas from the Trust's wells pursuant to a Gas Purchase Contract with ONEOK Field Services Company, L.L.C. ("ONEOK"). The Gas Purchase Contract was first executed in 1984 by parties unrelated to this matter. ONEOK and XTO are both successor parties to the contract, which has been amended several times. ONEOK succeeded KN Energy, who was designated as "Buyer" in the original agreement. Later, XTO succeeded Plains Petroleum Company, who was designated as "Seller" in the contract. In amendments to the original

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

contract, ONEOK and XTO retained their respective titles as buyer and seller.   XTO and

ONEOK are not affiliated with each other.   As amended, the Gas Purchase Contract provides for

ONEOK to purchase gas from XTO at the wellhead for an index price—meant to reflect the sale

price of gas after it had been further processed—less $0.33 per MMBtu.   The amended contract

also provides that XTO will deliver "in-kind fuel" to ONEOK as part of the transaction.   XTO is

required to deliver the gas to ONEOK in a condition specified in the contract.   The contract

specifies that "[t]itle to the gas delivered hereunder shall pass to Buyer at the actual point of

delivery herein specified and provided for.   Thereafter sole responsibility and liability for the gas

shall attach to buyer."   XTO pays the Trust 1/8 of the proceeds from its wellhead sale to

ONEOK.   Alan Bates, an employee of ONEOK, claims that the gas it purchases from XTO is

marketable at the wellhead.   But in representations to shareholders, ONEOK has taken the

position that raw gas must be processed and separated to reach marketable condition.

The Trust attempts to controvert some of the above facts.   The Trust refutes XTO's claim

that this Gas Purchase Contract constitutes the sale of gas at the wellhead.[2]   But the Trust does so

by simply denying the allegation, claiming "the gas contracts speak for themselves," and citing

to all of XTO's Gas Contracts (Doc. 287, Ex. 2).   This exhibit comprises 16 separate documents

that total 690 pages.   The Trust does not cite a specific paragraph, page, or even a particular

document to support its denial of XTO's claim that it sold gas at the wellhead.   The Trust also

denies XTO's claims that the amended Gas Purchase Contract provided terms under which

ONEOK would purchase gas from XTO and required the gas meet certain quality standards at

---

[2] XTO supports this claim by citing specific paragraphs from declarations of XTO's regional manager and ONEOK's gas supply director.   In addition, XTO broadly cites the original gas purchase agreement and the amendments thereto.

the wellhead.[3]  But the Trust refutes these claims by citing the entire 1985 Gas Purchase Contract and the entirety of every amendment thereto (Doc. 380, Ex. B 1-8).  Those exhibits total 105 pages, and once again, the Trust fails to direct the Court to a relevant paragraph, page, or version of the contract in its citation.

A party opposing summary judgment cannot simply rest on its pleadings; rather, it "must bring forward specific facts showing a genuine issue."[4]  Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure dictates that a party must cite "to particular parts of materials in the record" to assert that a fact is genuinely disputed.  District of Kansas Rule 56.1(b) states in relevant part that in a memorandum opposing summary judgment, "[e]ach fact in dispute must . . . refer with particularity to those portions of the record on which the opposing party relies."  The Court will only consider evidence that is submitted in conformity with its rules.[5]  And hundreds of pages of documents are not specific facts.  The Trust fails to controvert XTO's facts with specific facts as required by the Federal Rules of Civil Procedure, the Tenth Circuit, or local rules.  Accordingly, the Court will not consider the Trust's denials.  The Trust is right: the Gas Purchase Contract speaks for itself.  The specific portions of the contract and specific paragraphs of declarations cited by XTO demonstrate that at the wellhead, XTO sold gas to ONEOK.

**B.  Conservation Fees Claim**

The Kansas Corporation Commission imposes a conservation fee on operators.  Prior to 2011, XTO deducted these conservation fees from royalty payments made to the Trust.  During

---

[3] XTO supports these claims by citing to a paragraph from the declaration of XTO's regional manager and both to the entire original Gas Purchase Agreement and a four-page amended version detailing the purchase price terms.

[4] *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

[5] *Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1231 (10th Cir. 2015).

this time, XTO's royalty payment check-stubs did not specifically state that conservation fees were being deducted from the royalty payments.  Rather, those deductions were included in a non-itemized section that described deductions for severance/production taxes.  In 2011, the Kansas Supreme Court decided *Hockett v Trees Oil Co.*[6]  The *Hockett* case held that an operator may not deduct conservation fees from payments to royalty owners.[7]  Following this decision, XTO refunded to royalty owners all such deductions taken from January 1, 2004 through June 30, 2012.  XTO paid interest on its refunds at the rate of prime plus 1.5%.

The Trust is unsatisfied with XTO's refunds.  The Trust argues that XTO should have paid interest at a rate of 10%, and not prime plus 1.5%.  Additionally, the Trust seeks refunded conservation fees from 1999 through 2003, which XTO has not paid.  XTO now seeks summary judgment that the Trust has no claim for underpayment of interest on the refunded fees and that any claims for conservation fees deducted before 2004 are barred by the statute of limitations.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[8]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidenced permits a reasonable jury to decide the issue in either party's favor.[9]  The moving party bears the initial burden of proof, and must show the lack of evidence on an

---

[6] 292 Kan. 213, 251 P.3d 65 (2011).

[7] *Id.* at 223-24. 351 P.3d at 72.

[8] Fed. R. Civ. P. 56(a).

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

essential element of the claim.[10]  If the moving party carries this initial burden, the non-moving

party that bears the burden of persuasion at trial may not simply rest on its pleading but must

instead "set forth specific facts" from which a rational trier of fact could find for the non-moving

party.[11]  These facts must be clearly identified through affidavits, deposition transcripts, or

incorporated exhibits—conclusory allegations alone cannot survive a motion for summary

judgment.[12]  To survive summary judgment, the non-moving party's evidence must be

admissible.[13]  The Court views all evidence and reasonable inferences in the light most favorable

to the party opposing summary judgment.[14]

## III.    Analysis

### A.  Marketable Condition Claim

Oil and gas leases impose on the operator—XTO in this case—an implied duty to market

the minerals produced.[15]  Corollary to this implied duty to market is the marketable condition

rule, which "requires operators to make gas marketable at their own expense."[16]  Steps taken to

make raw gas marketable often include gathering, compression, dehydration, treatment, and

---

[10] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322-23 (1986)).

[11] *Id.* (citing Fed. R. Civ. P. 56(e)).

[12] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)).

[13] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[14] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[15] *See Fawcett v. Oil Producers, Inc. of Kan.*, 302 Kan. 350, 351, 352 P.3d 1032, 1034 (2015); *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 331, 894 P.2d 788, 800 (1995).

[16] *Fawcett*, 302 Kan. at 352, 352 P.3d at 1034-35; *see also Sternberger*, 257 Kan. at 330, 894 P.2d at 799-800 ("The lessee has the duty to produce a marketable product, and the lessee alone bears the expense in making the product marketable.").

processing ("GCDTP") services.[17]   But in other circumstances, gas may be marketable at the well.[18]   An operator's specific royalty obligations and the allocation of expenses under the marketable condition rule turn on express and implied obligations contained in the relevant lease.[19]

The Trust claims that XTO failed to make gas marketable at its own expense.  The Trust contends that the gas in question was not in marketable condition when XTO sold it to ONEOK at the wellhead.  Instead, these alleged sales were a vehicle by which XTO skirted the marketable condition rule.  According to the Trust, the wellhead transaction between XTO and ONEOK was a sale in name only.  In reality, XTO was purchasing midstream services from ONEOK, and passing those costs on to the Trust in violation of the marketable condition rule.  In other words, the Trust argues that the $0.33 per MMBtu deduction from the index price and the in-kind transfers to ONEOK are essentially costs for making the gas marketable.  And so the Trust claims that it shares in costs to make gas marketable because XTO's proceeds from its wellhead sale to ONEOK—from which royalties are paid—are improperly adjusted for midstream services.

XTO, on the other hand, contends that it satisfied its express and implied royalty obligations by selling gas at the wellhead and paying 1/8 of the proceeds to the Trust.  In light of *Fawcett v. Oil Producers of Kansas, Inc.*, XTO now seeks summary judgment on the Trust's marketable condition claim.

---

[17] *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1216 (10th Cir. 2013).

[18] *See, e.g.*, *Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

[19] *Fawcett*, 302 Kan. at 359, 352 P.3d at 1038.

### 1.   Condition or Quality of the Gas

XTO first challenges the Trust's reliance on the theory that the marketability of gas can be determined by its precise quality or condition.  In its amended complaint, the Trust alleges that a good faith sale of gas can only occur after necessary midstream services are performed.  In its response to XTO's motion for partial summary judgment on the marketable condition claim, the Trust asserts that the condition of the gas is one factor that a jury would need to consider to determine whether gas was in marketable condition.  And the Trust's experts opine that until midstream services have been performed, gas cannot be in marketable condition and a good-faith sale of gas cannot occur.   XTO challenges this theory, arguing that under *Fawcett*, the marketability of gas does not turn on its quality or condition.  The Court agrees.

*Fawcett* held that the implied duty to market and the marketable condition rule "do not impose on the operator as a matter of law the responsibility to perform the post-production, post-sale [GCDTP services]."[20]   There is no "precise quality or condition at which gas becomes marketable."[21]   Rather, the marketability of gas depends on the parties' willingness to buy and sell it.[22]  "[T]he duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[23]   If XTO delivered the gas in a condition acceptable to ONEOK in a good faith transaction, then the gas was in marketable condition.

---

[20] *Id.* at 352, 352 P.3d at 1035.

[21] *Id.* at 363, 352 P.3d at 1041 (internal quotation marks omitted).

[22] *Id.*

[23] *Id.* at 365, 352 P.3d 1042.

Because there is no objective quality or condition at which gas becomes marketable, the Trust cannot recover on a theory that the gas was not marketable because it required certain improvements.  The only relevant inquiry into the quality of gas is whether it was in a condition acceptable to the purchaser.   Whether raw or completely processed, gas is in marketable condition if a purchaser accepts it as is in a good faith transaction.

**2.  Sale at the Wellhead**

The marketability of gas turns not on its precise quality, but rather on whether it is delivered in a condition acceptable to the purchaser in a good-faith transaction.  Under this standard, XTO argues it satisfied the duty to market when it delivered gas at the wellhead to ONEOK.  XTO asserts that its dealings with ONEOK were fair, reasonable, and typical of the industry.  Ultimately, XTO contends it delivered gas to ONEOK in a condition acceptable to ONEOK at no cost to the Trust.  XTO asserts that the Trust cannot show otherwise, and thus, summary judgment is proper.

The Trust argues that XTO is not entitled to summary judgment regarding its wellhead transactions with ONEOK because there are genuine factual disputes.  Notably, the Trust disputes that (1) transactions between ONEOK and XTO were good faith sales, and (2) ONEOK was a "purchaser" of gas in an acceptable condition.

*(a) Good Faith Transaction*

*Fawcett* holds that "the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[24]  *Fawcett* stands for the seemingly obvious proposition that gas is in marketable

---

[24] *Id.*

-9-

condition once it can be marketed.[25]  But the operator must market the gas in *good faith* to satisfy

its duty to market.  The Trust argues that the Gas Purchase Contract between XTO and ONEOK

was not a good faith sale, and thus, the gas was not in marketable condition when it was

delivered to ONEOK.

XTO contends that its good faith should be measured under the prudent operator

standard; probably because the *Fawcett* court referred to this standard in dicta.[26]  But the prudent

operator standard is distinct from the good faith prong of marketability.  The prudent operator

standard is an offshoot of the implied duty to market, and would be relevant if the Trust claimed

that XTO violated that duty by failing to market the gas on reasonable terms.[27]  Here, the Trust

does not quarrel with the price XTO received for the gas.[28]  And so the prudent operator standard

does not apply.  Rather, *Fawcett's* requirement that gas be subject to a good faith transaction in

order to be marketable is a much more straightforward requirement.  It protects royalty owners

from sham sales, and is consistent with well-established Kansas law.[29]  XTO must have really

been selling the gas to ONEOK, and not—as the Trust contends—engaging in a midstream

processing agreement that is only called a sale in order to skirt the marketable condition rule.  So

---

[25] *Id.*

[26] *Id.* at 366, 352 P.3d at 1042 ("[W]e believe royalty owners' interests are adequately protected by the operator's implied covenant of good faith and fair dealing and the implied duty to market.  The latter demands that operators market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence, having due regard for the interests of *both* lessor and lessee, would do under the same or similar circumstances.").

[27] *See Smith v. Amoco Prod. Co*, 272 Kan. 58, 81, 31 P.3d 255, 271 (2001) (citing *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 131, 785 P.2d 1010, 1015 (1990)).

[28] In its response to XTO's motion, the Trust notes "the best price reasonably available for valuable gas products was protected by obtaining the index or WASP market price for the fungible commodities which all of XTO's gas contracts do."

[29] *Waechter v. Amoco Prod. Co.*, 217 Kan. 489, 510, 537 P.2d 228, 248 (1975) (noting that a lessee's duty to a lessor "is to act honestly and fairly.").

for purposes of marketability, the key question is whether the Gas Purchase Contract was a good faith sale. Under Kansas law, a gas purchase agreement constitutes a sale of goods, and is governed by the Uniform Commercial Code ("UCC") and Chapter 84 of the Kansas Statutes Annotated.[30] Both XTO and ONEOK are professionals in their fields, and are thus "merchants" as defined in the UCC.[31] For merchants, the standard of good faith is both objective and subjective; it means both honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.[32] Whether parties are transacting in good faith is a question of fact.[33]

The Gas Purchase Contract, which was originally executed in 1984, lists the operator as "seller" and the midstream producer as "buyer." When XTO and ONEOK became successors to the agreement, they retained those respective titles. XTO and ONEOK are not affiliated with each other, and the Gas Purchase Contract was negotiated at arm's length. Managers from both XTO and ONEOK considered their agreement to be fair, reasonable, and typical of the industry. Additionally, the manager of another midstream purchasing company testified that agreements like the Gas Purchase Contract were quite common and negotiated at arm's length in an active market. With the exception of fuel delivered in-kind to ONEOK as part of the sale price, XTO sells all of the gas from the Trust's wells under the Gas Purchase Contract. Title and physical

---

[30] *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 7 Kan. App. 2d 131, 139, 638 P.2d 963, 969 (1981) ("The Code clearly applies here. The sale of gas contemplated by the agreement was the 'sale' of "goods.' "); *see also Barbara Oil Co. v. Kan. Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24, 34 (1992).

[31] Kan. Stat. Ann. § 84-2-104, Official UCC Comment, subsection 1 (noting that "merchant" definition applies to "professionals in a given field.").

[32] *Hammer v. Thompson*, 35 Kan. App. 2d 165, 177, 129 P.3d 609, 617 (2006); *see also* Kan. Stat. Ann. § 84-2-103, Kansas Comment, 1996, subsection 3.

[33] *Horn v. Beal*, 137 Kan. 777, 22 P.2d 475, 478 (1933) ("Whether that was an actual sale in good faith or one made to deceive and defraud plaintiff was a question of fact for the jury."); *see also Fawcett*, 302 Kan. at 360, 352 P3d. at 1039 (noting that determining whether an operator entered into a good faith sale requires "a fact-based analysis.").

possession of all of the gas pass to ONEOK.  XTO pays the Trust 1/8 of its proceeds under the Gas Purchase Contract.  Given these facts, XTO contends that the Gas Purchase Contract constitutes a good faith sale of gas.

In response, the Trust contends that the question of whether XTO transacted in good faith is one of fact for the jury, not for the Court on summary judgment.  To demonstrate a genuine issue of material fact, the Trust is required to set forth specific facts.[34]  Because the Trust does not dispute XTO's claim that the Gas Purchase Contract was typical to the industry, it can only challenge XTO's good faith by disputing the parties' honesty-in-fact.[35]  The Trust fails to do so.

The Trust seeks to controvert XTO's claim that the Gas Purchase Contract was a good faith sale only by citing to its expert opinions.  Dr. William Foster opines paper title transfer of gas prior to necessary midstream services cannot constitute a good faith sale.  According to Dr. Foster, "[r]aw gas and its constituent parts are marketable only when they are in the physical condition to be bought and sold in a commercial marketplace. Any transaction before that state of processing is not a 'good faith sale' of marketable products."  This opinion fails to raise a genuine issue of material fact.

*Fawcett* dictates that gas is in marketable condition if it is marketed in a good faith transaction.[36]  But Dr. Foster opines that gas cannot be marketed in a good faith transaction until it reaches some objective marketable condition.  To accept Dr. Foster's opinion would run contrary to Kansas law as articulated in *Fawcett*.  A good-faith transaction makes gas marketable, not the other way around.  The Trust also cites the expert opinion of Daniel Reineke.

---

[34] *E.g., Burbidge Mitchell & Gross v. Peters*, 622 F. App'x 749, 752-53 (10th Cir. 2015).

[35] Kan. Stat. Ann. § 84-2-103, Kansas Comment, 1996, subsection 3.

[36] *Fawcett*, 302 Kan. at 365, 352 P.3d 1042.

He opines that XTO's wellhead transfers do not constitute a "sale" because "raw gas is not in marketable condition" because "government regulations or market forces set standards that each of the products from raw gas stream must meet in order to be in marketable condition."  Like Dr. Foster, Reineke's opinion relies heavily on the theory that gas is in marketable condition when it meets some objective standard.[37]  This is not surprising, considering that Reineke's expert report is dated October 13, 2014—nine months before *Fawcett* rejected that very premise.  But in any event, the opinion that gas must meet some objective condition or quality in order to be marketable is not sufficient evidence to survive summary judgment.   An ill-reasoned expert opinion that rests on an error of fact or law does not raise a genuine issue of material fact.[38]

All told, the Trust fails to show a genuine issue of material fact regarding the question of whether the Gas Purchase Contract constituted a good faith sale.   XTO has presented evidence that the contract was negotiated in good faith at arm's length, was typical to the industry, and constituted a legitimate sale of gas.   To demonstrate a factual dispute, the Trust was required to present specific facts.[39]  But the Trust cited generally to all of XTO's gas contracts—which are not specific facts, and which do not dispute XTO's claim that it sold gas to ONEOK.   And the Trust cited to two expert reports who opined that the sale of gas was not in good faith because the gas not in marketable condition.   These opinions are conclusory and reverse the standard set forth in *Fawcett*.   "[A] genuine issue of material fact cannot be shown from merely conclusory

---

[37] Reineke also controverts XTO's claim that it is no longer responsible for the gas after it is sold to ONEOK.  Reinke claims that XTO remains responsible for the gas by citing all of the gas contracts—all 690 pages of them.  This opinion also fails to raise a genuine issue of material fact. *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("[A]n expert opinion may not be sufficient to overcome summary judgment if 'it is conclusory and thus fails to raise a genuine issue of material fact.' ") (quoting *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999)).

[38] *Heiman v. United Parcel Serv., Inc.*, 12 F. App'x 656, 664 (10th Cir. 2001).

[39] *Burbidge Mitchell & Gross,* 622 F. App'x at 752-53.

-13-

allegations.  In order to be of any value to the judicial process at the summary judgment stage, an expert's opinion must, at a minimum, set forth "a process of reasoning beginning from a firm foundation."[40]

Accordingly, the Court finds that XTO marketed gas from the Trust's wells in a good faith transaction by selling it at the wellhead to ONEOK.

### (b) Delivered to a Purchaser in an Acceptable Condition

*Fawcett* dictates that "the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[41]  The Trust argues that ONEOK was a midstream service provider, and not actually a purchaser as understood in *Fawcett*.  The Trust also claims that XTO failed to provide evidence that the gas was acceptable to ONEOK.

The Gas Purchase Contract, which was originally executed in 1984 and to which XTO and ONEOK are successor parties, has consistently referred to the operator as the seller and the mid-stream company as the buyer.  Additionally, managers of both companies take the position that ONEOK purchased the gas from XTO.  In response, the Trust argues that "[a] real purchase requires a fungible product in the Index market pool" and that a purchaser "must be one who satisfies XTO's duty to get the best possible price."  The Court finds neither of these argument convincing.

The Trust asserts that gas at the wellhead is not a "fungible product," and accordingly, one cannot purchase this apparently non-fungible product at the wellhead.  But this argument is

---

[40] *City of Chanute v. Williams Nat. Gas Co.*, 743 F.Supp. 1437, 1445 (D. Kan. 1990) (quoting *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

[41] *Fawcett*, 302 Kan. at 365, 352 P.3d at 1042.

unsupported by Kansas law.  Well before *Fawcett*, Kansas courts recognized that raw gas could be marketable at the well.[42]   Whether the Trust's experts consider raw gas fungible is immaterial—parties regularly purchase raw gas at the wellhead.  Moreover, the Trust's argument necessarily insists that one can either be a purchaser of gas or a midstream processer, but not both.  But Kansas courts recognize that operators can, and do, sell gas to purchasers who later enhance the purchased gas.[43]  And such costs can be properly charged against a royalty owner.[44]

The Trust also argues that a purchaser must satisfy XTO's duty to get the best possible price.  This is an interesting argument, considering that in its response to XTO's motion, the Trust admitted "that the best price reasonably available for valuable gas products was protected by obtaining the index or WASP market price for the fungible products which all of XTO's gas contracts do."  Moreover, Kansas law regarding the "best possible price" test is rather intricate, and the Trust's allegations do not even begin to make a showing that XTO failed to meet this standard.  The best possible price standard has also been phrased as "best prices obtainable at the place where the gas was produced."[45]  An action for failure to market at the best price involves an operator intentionally selling gas below the best possible price that could be obtained.[46] When determining whether an operator fulfilled its duty to market gas at a reasonable price, "[t]he greatest possible leeway should be indulged the lessee in his decisions about marketing

---

[42] *E.g.*, *Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

[43] *See Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 362, 292 P.3d 289, 306 (2013); *Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

[44] *Sternberger*, 257 Kan. at 331, 894 P.2d at 800 ("Once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners.").

[45] *Smith*, 272 Kan. at 60, 31 P.3d at 258 (quoting *Maddox v. Gulf Oil Corp.*, 222 Kan. 733, 735, 567 P.2d 1326, 1328 (1977)).

[46] *Id.* at 81, 31 P.3d at 271.

gas . . . . Ordinarily, the interests of the lessor and lessee will coincide."[47]  Given this framework, the Court rejects the Trust's several arguments as to why ONEOK cannot satisfy *Fawcett's* purchaser requirement.  There is no evidence controverting the fact that ONEOK was a purchaser of gas.

The Trust also contests XTO's assertion that it "delivered gas to ONEOK at the well in a condition acceptable to ONEOK free of cost" to the Trust.  The Trust asserts that "[n]o gas analysis is provided to show the raw gas was acceptable to ONEOK."  There is no such requirement under Kansas law.  In *Fawcett*, as here, the operators sold raw gas at the wellhead to third parties.[48]  *Fawcett's* obligation that gas be acceptable to the purchaser requires only that the gas be "in condition to be sold."[49]  The fact that ONEOK accepted all of the gas demonstrates that it was in acceptable condition.  The Trust also contends that the gas was not put in this condition free of cost.  Rather, the Trust argues that XTO's claim ignores the deductions from the index price at which ONEOK purchased the gas.  This argument misstates XTO's assertion.  In its motion, XTO asserted that it rendered the gas into a condition acceptable to ONEOK at no cost to the Trust.  And the Trust does not dispute that claim.  The only deductions that the Trust complains of are the $0.33 per MMBtu deduction from the index price and the in-kind transfer that occurred during the wellhead sale.  Those costs are unrelated to any services or processing performed on the gas prior to the wellhead transfer.  Rather, those costs reflect the subsequent processing that ONEOK would perform on the gas after purchasing it.  And as noted above,

---

[47] *Robbins*, 246 Kan. at 131-32, 785 P.2d at 1015 (quoting 5 Williams & Meyer, *Oil and Gas Law* § 856.3 (1989)).

[48] *Fawcett*, 305 Kan. at 351, 352 P.3d at 1033.

[49] *Coulter,* 296 Kan. at 362, 292 P.3d at 306.

reasonable costs that are incurred to enhance marketable gas may properly be charged against royalty owners.[50]   While the Trust may claim that later deductions were improper, there is no disputing that the Trust bore no costs required for XTO to deliver the gas to ONEOK at the wellhead.

XTO has demonstrated that it delivered gas to ONEOK—a purchaser—in a condition acceptable to ONEOK, and the Trust has failed to raise a genuine issue of material fact disputing that claim.

### 3.   Royalty Clause Obligation

The Gas Purchase Contract was a good faith transaction, and pursuant to that transaction XTO delivered gas to ONEOK in an acceptable condition.   The last question is whether XTO satisfied its royalty obligations under the relevant lease provisions.

*Fawcett* reaffirmed that an operator's "royalty obligation and the allocation of expenses under the marketable condition rule requires [the Court] to interpret the leases and the express and implied obligations arising from them."[51]   The leases in *Fawcett* took two general forms. One variation required that the operator "shall pay [the royalty owner] as royalty 1/8 of the proceeds from the sale of gas as such at the mouth of the well where gas only is found."[52]   The other form provided that the operator "shall monthly pay [the royalty owner] as royalty on gas marketed from each well where gas only is found, one-eighth (1/8) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (1/8) of its market value at

---

[50] *See Sternberger*, 257 Kan. at 331, 894 P.2d at 800.

[51] *Fawcett*, 302 Kan. at 359, 352 P.3d at 1038.

[52] *Id.* at 354, 352 P.3d at 1036.

the well."[53]  The Kansas Court of Appeals had found that given the lease language and facts of

the case, the geography for both the sale of gas and the calculation of the royalty was at the

well.[54]  On appeal, the parties did not contest that finding and the Kansas Supreme Court did not

disturb it.  The Kansas Supreme Court went on the hold that "when a lease provides for royalties

based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the

operator's duty to bear the expense of making the gas marketable does not, as a matter of law,

extend beyond that geographical point."[55]

       The leases between the Trust and XTO also took two general forms.  One form mirrors a

lease variation in *Fawcett*, and the other does not.  Royalty Provision 1 provides that XTO shall

pay as royalty "one-eighth (1/8) of the proceeds if sold at the well or, if marketed by lessee off

the leased premises, then one-eighth (1/8) of the market value thereof at the well."  This is a

*Waechter* lease, and is nearly identical to one of the clauses in *Fawcett*.[56]  Here, as in *Fawcett*,

this royalty clause provides for calculation of the royalty at the well by noting that the Trust is

entitled to 1/8 of proceeds *if sold at the well*.  And here, as in *Fawcett*, XTO sold gas to ONEOK

at the wellhead.  In fact, the terms of the wellhead transactions in this case and *Fawcett* are quite

similar.[57]  So XTO argues that under *Fawcett*, it satisfied its duty to market and its royalty

obligations by selling all of the gas at the well, and paying the Trust 1/8 of the proceeds it

---

[53] *Id.*

[54] *Fawcett v. Oil Prods. Inc. of Kan.*, 49 Kan. App. 2d 194, 199, 306 P.3d 318, 321 (Kan. App. 2013) (*rev'd on other grounds,* 302 Kan. 350, 352 P.3d 1032 (2015)).

[55] *Fawcett*, 302 Kan. at 365, 352 P.3d at 1042.

[56] *See Waechter* 217 Kan. at 509-12, 537 P.2d at 247-50.

[57] *Fawcett* at 354, 352 P.3d at 1036 ("[T]hird-party purchasers pay [the operator] for the raw gas received at the wellhead based on a percentage of specified index prices of the third-party purchasers' actual revenue when that gas is sold to others, reduced by certain costs.").

received at the well.  The Trust tries to distinguish its facts from *Fawcett* by arguing that in that case, the Kansas Supreme Court did not hold that under the royalty provisions, geography of the gas sale and royalty calculation was at the well.  The Trust claims that unlike the plaintiffs in *Fawcett*, it challenges the geographies of the sale of gas and royalty calculations.  Technically, the Trust is right that the Kansas Supreme Court in *Fawcett* did not find that both the sale and calculation of the royalty occurred at the well.  The Kansas Court of Appeals made such a finding, and neither the parties nor the Kansas Supreme Court quarreled with or disturbed that finding on appeal.  Neither will this Court.  The Kansas Court of Appeals found that under a *Waechter* lease, when gas is sold at the well, royalties are to be based off of the proceeds of that wellhead sale.  This is well settled law.  When gas is sold at the wellhead pursuant to a *Waechter* lease, the royalty owner is entitled to no more that his proportionate share of the amount actually received in the sale.[58]  That is another way of saying that royalty payments are calculated based on the wellhead sale.

The geography of the sale is a question of fact, and the geography of royalty calculations turns on the lease language, the interpretation of which is a question of law for the Court.[59]  The uncontroverted facts in this case show that XTO sold gas to ONEOK at the well, and the royalty payments were based on those sales.  Accordingly, when XTO sold the Trust's gas at the well pursuant to the *Waechter* lease, the geography for the calculation of the royalty was also at the well.  So under Royalty Provision 1, as in *Fawcett*, the lease provided for royalties based on a

---

[58] *Waechter*, 217 Kan. at 489, 537 P.2d at 230, Syl. ¶ 2.

[59] *Duffin v. Patrick*, 212 Kan. 772, 778, 512 P.2d 442, 447-448 (1973); *see also* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730.1, 61-63 (3d ed. 2004).

share of proceeds from the sale of gas at the well.[60]  Here, as in *Fawcett*, the operator sold all of the gas at the wellhead and paid the Trust 1/8 of the proceeds.  And so here, as in *Fawcett*, XTO satisfied its royalty obligations and the marketable condition rule under Royalty Provision 1.[61]

Royalty Provision 2 provides that XTO shall pay the Trust as royalty "one-eighth (1/8) of the gross proceeds at the prevailing market rate."  Generally, leases fall into one of three types of royalty clauses: (1) the proceeds lease; (2) the market value lease; and (3) the *Waechter* lease.[62]  But Royalty Provision 2 contains language implicating both market value and proceeds leases.  "Market value leases require the computation of royalty payments based on the price that would be paid by a willing buyer to a willing seller in a free market."[63]  In a proceeds lease, although language may vary, "the pertinent language regarding the payment of royalties is that the lessee shall pay the royalty owner a share of the actual moneys received from the sale of the gas."[64]  XTO contends that this lease is a proceeds lease, but argues that even if the Court construed it as a market value lease, it satisfied its royalty obligations.  However, the difference is significant.  Under *Fawcett*, the question of whether an operator satisfied its duty to market is much easier when a proceeds lease is involved.[65]  The Trust, on the other hand, claims that Royalty Provision

---

[60] *Fawcett*, 302 Kan. at 3365, 352 P.3d at 1042.

[61] *Id.*

[62] Under a proceeds lease, the operator is required to pay the royalty owner a share of the actual monies received from the sale of the gas. *Smith*, 272 Kan. at 76, 31 P.3d at 268-69.  Under a market value lease, royalty payment amounts are based on the price that would be paid by a willing buyer to a willing seller in a free market. *Id.* And a *Waechter* lease is a hybrid of a proceeds and a market value lease.  Under a *Waechter* lease, royalties are calculated based on either proceeds or market value, depending on the location where gas is sold. *Waechter*, 217 Kan. at 509-12, 537 P.2d at 247-49.

[63] *Fawcett*, 49 Kan. App. 2d at 198, 306 P.3d at 321 (citing *Matzen v. Cities Servs. Oil Co.*, 233 Kan. 846, 851, 667 P.2d 337, 341 (1983)).

[64] *Id.* (citing *Smith*, 272 Kan. at 76, 31 P.3d at 268-69).

[65] *Fawcett*¸ 302 Kan. at 365, 306 P.3d at 1042.

2 refers to the index price before the deduction and in-kind transfer, which represents the interstate pipeline price for gas.  Kansas courts have dealt with clauses like Royalty Provision 2 in the past, and neither XTO nor the Trust's reading of such a clause is supported by Kansas law.[66]

The Kansas Supreme Court decided *Lightcap v. Mobil Oil Corporation* at a time when the federal government had imposed a price ceiling for certain natural gas purchases that impacted the price at which operators could sell gas at the wellhead.[67]  During this period, operators would negotiate with purchasers for the sale of gas, and were required to reach a reasonable price for the gas.[68]  If the operator and purchaser could not agree, the gas purchase contract called for an arbitrator to fix a reasonable price.[69]  The parties stipulated that this arbitrated value represented the market value for the gas.[70]  The arbitrated figures in *Lightcap* were submitted for federal approval, and were ultimately adjusted downward pursuant to the above-mentioned federal regulation.[71]  The dispute in *Lightcap* was whether royalties were to be based off the market value or the proceeds of the actual sale—the lower price set by federal regulation.[72]

Given this dispute, a majority of the *Lightcap* court found that a lease like Royalty Provision 2 constituted a market value lease, and thus, royalties were to be paid on the arbitrated

---

[66] *See Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 478, 562 P.2d 1, 22 (1977).

[67] *Id.* at 450, 562 P.2d at 4.

[68] *Id.* at 451, 562 P.2d at 4-5.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 452, 562 P.2d at 5.

value for the wellhead sales.[73]  Therefore, the Court will also construe Royalty Provision 2 as a market value lease in the instant case.  As in *Lightcap*, the geography of the royalty calculation in this case is based on the wellhead sale.[74]  And so although the Trust claims otherwise, because the gas was sold at the wellhead, the geography of the royalty calculation is also at the wellhead under a market value lease.[75]  But while Royalty Provision 1 required XTO to simply pay royalties based on the proceeds of the wellhead sale, Royalty Provision 2—a market value lease—requires something different.  Where royalties are to be based on the market value of gas sold, that value is the price which would be paid by a willing buyer to a willing seller in a free market.[76]  The question now is whether XTO has demonstrated that its royalty payments satisfied Royalty Provision 2.  In other words, is the price that ONEOK paid XTO—index price less $0.33 per MMBtu and an in-kind transfer—the amount that a willing buyer would pay a willing seller at the well in a free market?

The market value for gas may be proven by any competent evidence, such as comparable sales.[77]  Here, XTO did not try to demonstrate that its sales satisfied the requirements of a market value lease; rather, XTO contends that it satisfied Royalty Provision 2 by valuing its royalty payments based on the proceeds of its sales to ONEOK.  The evidence that XTO did put forth

---

[73] *Id.* at 461, 562 P.2d at 11.

[74] *Id.*

[75] *Id.* at 478, 562 P.2d at 22 (Fatzer, C.J., concurring and dissenting) (noting that in a lease like Royalty Provision 2, "the lessor should be paid his royalty share on the basis of the market value *at the well* as evidenced by the arbitrated contract price.") (emphasis added); *see also,* 3A Nancy Saint-Paul, *Summers Oil and Gas* § 33:20, 174-75 (3d ed. 2008) ("Where leases provide for the payment of 1/8 royalty, the value of 1/8 of the gas, or the market value of 1/8, most courts hold that the lessor's royalty should be computed on the basis of the market value of the gas in the field, if that market value actually exists, and if it does not, on the basis of the reasonable value of the gas as established by competent evidence.").

[76] *Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 551, 664 P.2d 1335, 1342 (1983).

[77] *Id.* at 551, 664 P.2d at 1341.

demonstrates that XTO and ONEOK negotiated at arm's length, and its wellhead sales were typical to the industry.  But Kansas courts have rejected the proposition that as a matter of law, royalty obligations under market value leases are "discharged when the producer enters into an arm's-length, good faith gas purchase contract at the best price available at the time and then pays royalties based upon the proceeds received."[78]  Rather, under Kansas law an operator must provide evidence demonstrating that the royalty payments are based on the price a willing buyer would pay a willing seller in a free market.[79]  This can most easily be done with evidence of sales that are comparable in time, quality, quantity, and availability of marketing outlets.[80]  Expert testimony is another way in which a party could demonstrate the market value for gas at a given time and place.[81]  XTO fails to make such a showing here, and thus, cannot show as a matter of law that it satisfied its royalty obligations under Royalty Provision 2.

The Court would note that although under Kansas law, proof of an arm's-length transaction is not enough to show gas was sold at market value, it does not necessarily follow that royalty payments under a proceeds lease would differ from those in a market value lease.  When *Lightcap* was decided, federal regulation prevented operators from selling gas at its true market rate.  Therefore, the terms "proceeds" and "prevailing market rate" truly were contradictions, as the *Lightcap* court pointed out. [82]  Federally-set price ceilings play no role in the instant case.  Without artificial price ceilings, and assuming there was a market at the well, it

---

[78] *Matzen*, 233 Kan. at 855, 667 P.2d at 344.

[79] *Id.* at 854-55, 667 P.2d at 343-44.

[80] *Holmes*, 233 Kan. at 551, 664 P.2d at 1341.

[81] *Matzen*, 233 Kan. at 854, 667 P.2d at 343.

[82] *Lightcap*, 221 Kan.  at 478, 562 P.2d at 22 (Fatzer, C.J., concurring and dissenting) ("If 'proceeds' means actual sales price, and 'market rate' means the market value for the gas, this clause is obviously contradictory.").

is plausible that an arm's length, good-faith transaction would fairly represent the prevailing market rate, especially where the parties agree that XTO obtained the best possible price. And in such a case, the terms "proceeds" and "prevailing market rate" would not be contradictions, but rather, redundancies. But XTO must provide evidence that its sale price is typical of similar sales in a free market. Viewing the evidence in the light most favorable to the Trust, XTO has failed to make such a showing here.

Because under Kansas law, there is insufficient evidence that the royalties paid to the Trust were based off of the prevailing market rate for sales of gas at the wellhead, XTO has failed to demonstrate that it satisfied its "royalty's obligation and the allocation of expenses under the marketable condition rule" as a matter of law.[83]   Accordingly, the XTO's motion for partial summary judgment on the Trust's marketable condition claim is granted as to Royalty Provision 1, but denied as to Royalty Provision 2.

## B. Conservation Fees Claim

The Trust also seeks to recover conservation fees that XTO improperly deducted from royalty payments prior to 2011. Although XTO refunded conservation fees in light of the *Hockett* decision, the Trust contends that these refunds fall short for two reasons. First, the Trust argues that XTO underpaid interest on its refunded fees. XTO applied an interest rate of prime plus 1.5% while the Trust asserts it should have paid interest at a rate of 10%. Second, XTO refunded conservation fees that it deducted from royalty payments from 2004 until the middle of 2012, but not those that it deducted before that period. The Trust seeks to recover conservation fees that XTO deducted from royalty payments from 1999 through 2003.

---

[83] *Fawcett*, 302 Kan. at 358, 352 P.3d at 1038.

### 1.  Underpaid Interest

XTO argues that in refunding conservation fees to the Trust, it properly calculated a monthly interest rate of prime plus 1.5% under Kan. Stat. Ann. § 55-1614 *et seq.*[84]  Section 55-1614 *et seq.* governs interest payments from oil or gas productions, so XTO argues that it applies in this case.  But the Trust claims that § 55-1614 *et seq.* applies only to suspended royalty payments, and thus, is not applicable here.  Instead, the Trust contends that Kan. Stat. Ann. § 16-201 governs XTO's refunds, and calls for an interest rate of 10%.  XTO has the better argument.

Section 55-1614 was enacted in 1991 and is titled "Interest payments on payments from oil or gas productions; definitions."  The Kansas Supreme Court has noted that § 55-1614 *et seq.* governs the calculation of interest in an overriding royalty case.[85]  And in *Fankhouser v. XTO Energy, Inc.*, the Western District of Oklahoma found that §§ 55-1614 and 1615, and not § 16-201, applied in determining the interest rate for damages related to unpaid or underpaid royalty payments.[86]  The *Fankhouser* court reasoned that because § 16-201 is a general interest statute and §§ 55-1614 and 1615 specifically refer to payments from oil or gas productions, the more specific statute should apply.[87]  XTO advances the same argument here.

The Trust argues that § 55-1614 *et seq.* only applies to royalty suspense accounts, and not to interest on underpayment of royalties.  The Trust supports this claim by (1) appealing to the

---

[84] Kan. Stat. Ann. §55-1614 provides for a "rate equal to one and one-half percentage points above the interest rate charged on loans to depository institutions by the New York Federal Reserve Bank," which the Court will refer to as prime plus 1.5%.

[85] *Reynolds-Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 857, 1 P.3d 909, 921 (2000).

[86] *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4815538, at *4 (W.D. Okla. April 9, 2012) (applying Kansas law).

[87] *Id.* (citing *Garcia v. Anderson*, 46 Kan. App. 2d 1094, 1098, 268 P.3d 1248, 1251 (2012)).

general framework and case law; (2) referring to the design and structure of § 55-1615; and (3) citing to legislative history.

The "general framework and case law" relied on by the Trust is the fact that in the past Kansas courts have applied the § 16-201 interest rate for prejudgment payments of underpaid and unpaid royalties.[88]  But these cases are of little help in the instant case.  They were decided before § 55-1614 *et seq.* was passed.  When Kansas courts applied § 16-201's interest rate to underpaid royalties, there was not another competing, arguably applicable statute.  So those cases lend no guidance as to the question now before the Court: should the Court apply the more general or more specific statute in this case?

The Trust's citation to *Owen Lumber Co. v. Chartrand* is also unconvincing.  True, the Kansas Supreme Court did state in that case that prejudgment interest is governed by § 16-201.[89]  But that case arose from the plaintiff's mechanic lien against the defendant's property.[90]  *Owen Lumber* had nothing to do with payments from oil or gas productions, and thus also provides no guidance as to the specific question of which interest rate applies to refunds for underpaid gas royalties.  There is no dispute that § 16-201 is a general statute that applies to general cases, but it does not follow that the general statute applies to this specific case.

The Trust also argues that the design of § 55-1615 supports its claim that the statute does not apply in the instant case.  According to the Trust, § 55-1615 has several characteristics—such as starting and ending dates for the accrual of interest—that suggest the statute was only

---

[88] *Lightcap*, 221 Kan.at 468-69, 562 P.2d at 15-17; *see also Schupbach v. Continental Oil Co.*, 193 Kan. 401, 408, 394 P.2d 1, 6 (1964) (applying §16-201's interest rate on unpaid royalties).

[89] *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925, 157 P.3d 1109, 1119 (2007).

[90] *Id.* at 912, 157 P.3d at 1111.

intended to apply to situations in which operators suspended payments to other interest owners. But when looking at the design and structure of § 55-1614 and § 55-1615, the Court is most struck by the breadth of the statute, and its applicability here.

Section 55-1614 defines a "payee" as any person "whom payment of revenues accrued from the first sale of oil or gas from an oil or gas well located in Kansas should be made" if the payment arises from "*an interest in the producing property or a contract right to receive*" payment.[91]  The Trust was owed payment of royalties accrued from the sale of gas from its wells located in Kansas pursuant to a lease with XTO.  The Trust is a payee as understood in § 55-1614 *et seq*.  A payor is defined as the "first purchaser of production of oil or gas from an oil or gas well."[92]  And the first purchaser is the person who owns oil and gas after its severance from the ground.[93]  XTO is a payor as understood in the statute.  The statute calls for interest at a rate of prime plus 1.5% to be included on "any payment."[94]  A payment is "a sum to be paid to a payee by a payor arising from payee's interest in a first sale of oil or gas."[95] Here, XTO (payor) owed the Trust (payee) a sum pursuant to the Trust's royalty interest (payee's interest in a first sale of oil or gas).  Section 55-1615 is applicable.  The Trust is right that the start and end dates for the accrual of interest would apply to suspense accounts, and not here, but that does not mean that the entire statute is inapplicable.  Just because the statute covers suspense accounts does not

---

[91] Kan. Stat. Ann. § 55-1614(a) (emphasis added).

[92] Kan. Stat. Ann. § 55-1614(c).

[93] Kan. Stat. Ann. § 55-1614(d)-(e).

[94] Kan. Stat. Ann. § 55-1615.

[95] Kan. Stat. Ann. § 55-1614(b).

mean that it would not cover underpayment of royalties as well.  The interest rate applies "on *any payment*," whether it be suspended or underpaid royalties.

Lastly, the Trust argues that the legislative history for § 55-1614 *et seq.* "demonstrates that the intent was to address interest due on suspense accounts only."  But as noted above, the statute is clear.  Nothing in the statute suggests that it applies only to suspense accounts; rather, it plainly states that it applies to "any payment."  Based on the plain language of § 55-1615, the Court agrees with the Kansas Court of Appeals that the statute helps "owners of mineral interests from whom production revenue had been wrongfully withheld."[96]  And nowhere in the statute is this help limited only to those whose royalty payments had been suspended.  The improper deduction of conservation fees is a wrongfully withheld payment to which §55-1615 applies.

Given the plain language of § 55-1614 *et seq.*, the Court will not rely on legislative intent in order to add to the statute.[97]  Accordingly, the Trust's legislative history arguments are unconvincing.[98]  The Court agrees with the Western District of Oklahoma's decision in *Fanhouser*, and finds that the more specific statute—Kan Stat. Ann. §55-1615—applies in this case.  The proper interest rate for XTO's refund of conservation fees was prime plus 1.5%.

## 2.  Statute of Limitations

Following *Hockett*, XTO refunded all conservation fees that it had wrongfully deducted from 2004 through the middle of 2012.  But XTO did not refund conservation fees that it had deducted from 1999 through 2003.  The Trust now seeks to recover those fees as well.  XTO

---

[96] *Thoroughbred Assocs., L.L.C. v. Kan. City Royalty Co.*, 45 Kan. App. 2d 312, 332, 248 P.3d 758, 772 (2011) (*rev'd on other grounds*¸ 297 Kan. 1193, 308 P.3d 1238 (2013)).

[97] *In re. K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025, 1042 (2007).

[98] The Court has reviewed *Farrar v. Mobil Co.*, Case No. 01-CV-12 (Stevens County Dist. Ct. Mar. 15, 2012), which the Trust has cited to support its arguments.  For the reasons discussed above, the Court respectfully disagrees with that decision.

seeks summary judgment, arguing that the Trust's claim for conservation fees deducted before 2004 are barred by the statute of limitations.

The Trust first brought a claim for the wrongful deduction of conservation fees on March 10, 2009.  XTO argues that the Trust's cause of action for each incorrect royalty payment accrued individually on the date that each payment was underpaid.  Under Kansas law, "[a] cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes."[99]  And so XTO argues that any claim for a conservation fee that was wrongfully deducted before 2004, was barred by the five year statute of limitations.[100]  In response, the Trust argues that (1) breach of an oil and gas lease is not purely a contract claim; (2) equitable estoppel and  fraudulent concealment apply to prevent its claim from being barred; and (3) open account tolling applies to prevent its claim from being barred.

*(a) Breach of Oil and Gas Lease is a Contract Claim*

XTO's statute of limitations argument relies on the assumption that the Trust's conservation fee claim is an action for breach of contract.  But the Trust contends that breach of an oil and gas lease is not purely a contract claim.  The Trust cites Kansas cases noting the peculiarities involved with an oil and gas lease.[101]  But these cases are not particularly helpful, as neither addresses the question of whether a claim for breach of an oil and gas lease constitutes a contract claim for purposes of the statute of limitations.  And the Trust does not direct the Court

---

[99] *Pizel v. Zuspann*, 247 Kan. 54, 74, 795 P.2d 42, 54 (1990).

[100] *See* Kan Stat. Ann. § 60-511(1) (setting a five year statute of limitations for a breach of written contract action).

[101] *Ingram v. Ingram*, 214 Kan. 415, 422, 521 P.2d 254, 258 (1974) ("[A]n oil and gas lease is a hybrid property interest."); *In re Estate of Sellers*, 7 Kan. App. 2d 48, 51, 637 P.2d 483, 485 (1974) ("Neither is an oil and gas lease a usual contract.").

to any authority holding that a different statute of limitations should apply specifically to breaches of oil and gas leases.  Although oil and gas leases certainly have their idiosyncrasies, they are still an "agreement, contract, or promise in writing" to which the five year statute of limitations apply.[102]

*(b) Equitable Estoppel and Fraudulent Concealment*

The Trust also argues that the doctrines of equitable estoppel and fraudulent concealment toll the statute of limitations in this case.  The Trust uses the terms fraudulent concealment and equitable estoppel interchangeably, while XTO contends that the doctrines are distinct, and addresses them each in turn.  This makes for a confused analysis, through no fault of the parties. Kansas courts frequently recognize a distinction between fraudulent concealment and equitable estoppel, but they seldom reveal the precise difference between the two.  Fraudulent concealment consists of "any statement, word, or act which tends to the suppression of the truth."[103]  And under the theory of fraudulent concealment, if a defendant fraudulently suppresses the truth in order for the statute of limitations to run, the statute of limitations will be tolled.  Similarly, equitable estoppel applies when the defendant "lulls the adverse party into a false sense of security, forestalling the filing of suit until the statute has run."[104]  And this can be done by silence when the defendant has a duty to speak.[105]  Given this framework, it seems plain that fraudulent concealment is the type of behavior that would give rise to equitable estoppel.  And yet Kansas courts have prohibited plaintiffs from raising a fraudulent concealment claim in

---

[102] Kan. Stat. Ann. § 60-511; *see also Smith*, 272 Kan. at 69-76, 31 P.3d at 264-68.

[103] *Friends Univ. v. W.R. Grace & Co.*, 227 Kan. 557, 564, 608 P.2d 936, 941 (1980) (citation omitted).

[104] *Dunn v. Dunn*, 47 Kan. App. 2d 619, 639, 281 P.3d 540, 554 (2012).

[105] *Id.* at 639, 281 P.3d at 554.

contract cases, holding that the doctrine only applies to toll the statute of limitations in fraud cases.[106]  But at the same time, other Kansas decisions have recognized that a defendant can be equitably estopped from relying on the statute of limitations in breach of contract cases.[107]

While the Court strives to avoid such results, the apparent takeaway is that the difference between fraudulent concealment and equitable estoppel is merely semantic.  The Trust argues that in this case, the statute of limitations should be tolled under principles of fraudulent concealment and equitable estoppel.  In response, XTO argues that in Kansas, a claim of fraudulent concealment can only be raised in an action for fraud.  Very well.  Under Kansas law, XTO is correct that a claim of fraudulent concealment has no place in this contract case.  But under the same Kansas law, the Trust is free to raise a claim of equitable estoppel in this same contract case.[108]  As such, XTO's assertion that the Trust cannot argue fraudulent concealment—while technically correct—has little effect. [109]  The Court will still determine whether XTO—by

---

[106] *See Bonin v. Vannaman*, 261 Kan. 199, 206, 929 P.2d 754, 762 (1996); *McCoy v. Wesley Hosp. & Nurse Training Sch.*, 188 Kan. 325, 331-32, 362 P.2d 841, 847 (1961); *Atchison, Topeka & Santa Fe Ry. Co. v. Atchison Grain Co.*, 68 Kan. 585, 75 P. 1051 (1904).

[107] *See Klepper v. Stover*, 193 Kan. 219, 221, 392 P.2d 957, 959 (1964) (applying the doctrine of equitable estoppel where plaintiff sued to reform a lease); *Rex v. Warner*, 183 Kan. 763 770-71, 332 P.2d 572, 579 (1959) (conducting estoppel analysis in an action for breach of oral contract); *Dunn*, 47 Kan. App. 2d 619, 281 P.3d 540 (conducting estoppel analysis in a breach of contract case).

[108] This is implicitly the same result that was reached by Judge Vratil in *Freebird, Inc. v. Merit Energy, Co.*, 883 F. Supp. 2d 1026 (D. Kan 2012).  There, the Court found that under Kansas law, the fraudulent concealment tolling statute did not apply, and then went on to consider whether the doctrine of equitable estoppel applied in that case.

[109] At least one Kansas case has acknowledged this clunky framework.  Although not a contract case, the Kansas Court of Appeals, in *Robinson v. Shah,* found that technically, fraudulent concealment could not be raised to toll the statute of limitations in a medical malpractice case.  After expressing displeasure with the fact that fraudulent concealment could not be raised to stop the defendant from relying on the statute of limitations, the court went on to state "[w]e believe that a more focused rule should be employed in this case to prevent the law from being successfully used as a vehicle for fraud.  We refer to the doctrine of equitable estoppel." 23 Kan. App. 2d 812, 829, 936 P.2d 784, 796 (1997).

its silence—prevented the Trust from filing suit until the statute had run by lulling the Trust into a false sense of security.

In Kansas, application of the equitable estoppel doctrine rests with the sound discretion of the trial court.[110]   Under the doctrine of equitable estoppel, a plaintiff need not demonstrate fraud, bad faith, or the intent to deceive to estop the defendant, but an element of deception is required.[111]   Equitable estoppel can arise from the defendant's silence, if the defendant had a duty to speak.[112]   Equitable estoppel usually involves questions of fact, but when the facts are undisputed the Court may rule on the availability of the doctrine as a matter of law.[113] According to the Trust, the fact that XTO made disclosures on its check stubs is evidence that it had a duty to speak.   The Trust contends that XTO knew it was deducting conservation fees, but hid that fact from the Trust by categorizing those deductions as severance/production taxes.   The Trust claims it relied on these disclosures, and accordingly, did not seek to recover deducted conservation fees before 2004 until the statute of limitations had run.

XTO responds by arguing that the Trust failed to exercise due diligence.   To survive summary judgment, the Trust "must raise a genuine issue of material fact with respect to whether the exercise of reasonable diligence could have led it to discover the claims at issue."[114]   It is

---

[110] *Bankers Tr. Co. v. United States*, 29 Kan. App. 2d 215, 218, 25 P.3d 877, 880 (2001).

[111] *Dunn* 47 Kan. App. 2d at 639, 281 P.3d at 554.

[112] *Id.*

[113] *Id.*

[114] *Freebird*, 883 F.Supp.2d at 1037.

worth noting that XTO and the Trust were not in a fiduciary relationship.[115]  It is also significant that until 2011, it was not uncommon for operators to deduct conservation fees from royalty payments.[116]  Although deducted conservation fees were not conspicuously identified, they also were not concealed; rather, they were included as a severance/production tax.  True, the conservation fee was not technically a tax.  But it was a fee imposed by the state government that the Kansas Supreme Court would later describe as "akin to a production cost."[117]  So it was not unreasonable, or overtly deceptive, for XTO to include the conservation fee with the production tax.  All of the deductions were included on the check-stubs for the Trust's review and consideration.

Once XTO advanced argument and evidence in support of its statute of limitations defense, the Trust was required to respond with specific evidence to overcome that claim.  And in the context of equitable estoppel, that specific evidence must include evidence that the exercise of reasonable diligence would not have led it to discover the deduction of the conservation fees.[118]  The Trust advances no evidence that prior to 2009, it inquired as to the details of the severance/production tax listed on the check-stubs.  The Trust had audit rights and could have demanded detailed information about their royalty payments and deductions.[119]  The

---

[115] *Waechter*, 217 Kan. at 489, 537 P.2d at 230, Syl. ¶ 1 ("A lessee under an oil and gas lease is not a fiduciary to his lessor."); *Wolf v. Brungardt*, 215 Kan. 272, 284, 524 P.2d 726, 736 (1974) (noting that when a fiduciary relationship exists, "the duty of due diligence to discover the true facts is reduced.").

[116] *See generally Hockett*, 292 Kan. 213, 251 P.3d 65.

[117] *Id.* at 224, 251 P.3d at 72.

[118] *Freebird*, 883 F. Supp. 2d at 1037 ("[T]o survive summary judgment plaintiff must raise a genuine issue of material fact with respect to whether the exercise of reasonable diligence could have led it to discover the claims at issue.").

[119] Kan. Stat. Ann. § 55-1622(5).

Trust makes no allegation that it exercised any diligence that could have uncovered the deduction of conservation fees.

Because the Trust fails to demonstrate that it exercised due diligence regarding its claim for conservation fees, the doctrine of equitable estoppel does not bar XTO from relying on the statute of limitations.

*(c) Open Account*

Lastly, the Trust argues that the monthly royalty payments constitute open accounts that toll the statute of limitations. From the law and arguments advanced, it appears that these claims are the same ones put forth in *Freebird, Inc. v. Merit Energy Co.* They are as unconvincing here as they were in that case.

An open account is one that concerns "a connected series of debit and credit entries of reciprocal charges and allowances."[120] Open accounts are characterized as open, running, and mutual.[121] An open account is "unpaid or unsettled" or "left open for ongoing debit and credits" with a fluctuating balance.[122] There is a sense of fluidity with open accounts, as though they are part of an ongoing, mutual transaction. In *Spencer v. Sowers*, the Kansas Supreme Court found that three separate loans, subject to three separate agreements, did not consitute an open account.[123] Conversely, in *Sheldon Grain & Feed Co. v Schuetz*, the Court found that an open account existed where the plaintiff sold many items and frequently extended credit to the

---

[120] *Spencer v. Sowers*, 118 Kan. 259, 261-62, 234 P. 972, 973 (1925).

[121] *Sheldon Grain & Feed Co. v. Schuetz*, 207 Kan. 108, 113, 483 P.2d 1033, 1037 (1971).

[122] *Account*, Black's Law Dictionary (10th ed. 2014).

[123] *Spencer*, 118 Kan. 259, 234 P. at 974.

defendants, who were its regular customers.[124]   The mutual dealings "gave rise to offsetting liabilities."[125]

Monthly royalty payments are not open accounts.  They do not involve reciprocal charges nor do they give rise to offsetting liabilities.  XTO made monthly payments to the Trust.  The relationship did not include frequent credits or debits, the balance was not cumulative, and the dealings did not give rise to offsetting liabilities.  Each payment was one-sided and independent of the other.  Each payment was its own, closed account.

The Trust relies on *Wortman v. Sun Oil Co.* to assert that monthly royalty payments do in fact constitute an open account.  But as this Court noted in *Freebird*, *Wortman* is distinguishable from the instant case.

> *Wortman* did not address whether successive and ongoing royalty payments, like the ones at issue here, constitute an open account.  Instead it dealt with a single royalty payment which Sun Oil owed because it had suspended royalty payments that had accumulated over time.  Importantly, the royalty owners in *Wortman* did not contend that Sun Oil repeatedly breached its royalty agreements by suspending a portion of royalty payments.  Rather, they argued that Sun Oil breached its royalty agreements by not paying suspended royalty plus interest in July of 1976.  Thus *Wortman* has little if any bearing on whether defendant's ongoing obligations to pay royalties in this case constitutes an open account for purposes of the statute of limitations.[126]

The allegation in this case is that every time XTO deducted a conservation fee from a royalty payment, it was breaching its lease with the Trust.  Put another way, the conservation fee claim comprises several individual allegations of breach.  The Trust is not claiming that there was a single, ongoing breach in which payment was suspended and the debt continued to pile up.

---

[124] *Sheldon Grain & Feed Co.*, 207 Kan. at 113, 483 P.2d at 1038.

[125] *Id.*

[126] *Freebird*, 883 F. Supp. 2d at 1032-33.

Instead, the Trust's conservation fee claims arise from several individual monthly payments. Each of these payments was settled at the time they were paid, and were not part of a fluid, fluctuating mutual account. Due to the one-sided, non-reciprocal nature of XTO and the Trust's relationship, the Court finds that royalty payments do not constitute open accounts.[127]

The five year statute of limitations applies here. Because the monthly payments were closed accounts and the Trust did not exercise due diligence regarding the deductions, the statute of limitations is not tolled. Thus, any claims for conservation fees deducted before March 9, 2004, are barred by the statute of limitations.

### C. XTO's Motion to Review Magistrate Judge Birzer's Order

On February 24, 2016, Magistrate Judge Birzer granted the Trust's motion to amend its complaint in light of *Fawcett*. XTO promptly sought review of that order, taking issue with a single phrase in Judge Birzer's 18 page order. Specifically, XTO objected to Judge Birzer's statement that the definition of marketability "could not be decided as a matter of law."

The Court reviews a magistrate judge's findings as to matters of law under a contrary to law standard.[128] *Fawcett* held that as a matter of law, interstate pipeline quality is not equal to marketable condition.[129] In fact, *Fawcett* held that there is no "precise quality or condition at which gas becomes marketable."[130] Rather, the marketability of gas depends on the parties'

---

[127] *Id.*

[128] *McCormick v. City of Lawrence*, 2005 WL 1606595, at *2 (D. Kan. July 8, 2005).

[129] *Fawcett*, 302 Kan. at 361, 352 P.3d at 1039 ("We disagree with Fawcett's equating 'marketable condition' with interstate pipeline quality.").

[130] *Id.* at 363, 652 P.3d at 1041.

willingness to buy and sell it.[131]   Such a determination turns on facts and circumstances, like where the gas is sold and what the specific terms of the oil and gas lease require.

XTO contends that Judge Birzer's statement was incorrect because *Fawcett* states that "when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making gas marketable does not, *as a matter of law*, extend beyond that geographical point to post-sale expenses."   But when Judge Birzer stated that the definition of marketability could not be decided as a matter of law, she was not referring to a situation in which a specific lease provided for specific royalty payments and gas is sold in a particular manner, as the *Fawcett* court was doing when it made the above-recited finding.   Rather, Judge Birzer was saying that there is not an objective definition of marketability as matter of law: it depends on the facts.   In other words, there is no "precise quality or condition at which gas becomes marketable."[132]

Therefore, Judge Birzer was correct in stating that "while not necessarily defined by interstate pipeline quality [the marketability of gas] could not be decided as a matter of law." Accordingly, XTO's motion for review is denied.

## IV.    Conclusion

In marketing all of the gas from the Trust's wells, XTO satisfied the marketable condition rule.   Pursuant to a good faith transaction, XTO delivered all of the gas to ONEOK—a purchaser—in a condition acceptable to ONEOK.   Therefore, the gas was in marketable condition when it was sold at the wellhead, and the Trust bore no costs to render the gas into such condition.   XTO paid the Trust 1/8 of the proceeds of its wellhead sales to ONEOK.   And

---

[131] *Id.*

[132] *Id.*

that is all that Royalty Provision 1 required.  Therefore, XTO satisfied all of its implied and express royalty obligations under leases containing Royalty Provision 1.  But Royalty Provision 2 may have required different royalty payments, so the Court cannot find as a matter of law that XTO satisfied all of its implied and express royalty obligations under Royalty Provision 2.  Accordingly, the Court grants in part and denies in part XTO's motion for partial summary judgment on the Trust's marketable condition claim.

In refunding wrongly withheld conservation fees to the Trust, XTO applied the proper interest rate.  In addition, the Trust's claims for conservation fees that were improperly deducted from royalty payments prior to March 9, 2004, are barred by the five-year statute of limitations.  And finally, Magistrate Judge Birzer did not err when in stating that as a matter of law, there is no objective definition for marketability.

**IT IS THEREFORE ORDERED** that XTO's Motion for Partial Summary Judgment on the Trust's Marketable Condition Claim (Doc. 370) is hereby **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that XTO's Motion for Partial Summary Judgment on the Trust's Conservation Fees Claim (Doc. 372) is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that XTO's Motion for Review of Memorandum and Order (Doc. 421) is hereby **DENIED.**

**IT IS SO ORDERED**.

Dated this 28th day of July, 2016.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE